## MEMBERS OF IRON WORKERS' UNION OF PROVO v. INDUSTRIAL COMMISSION et al.

## MEMBERS OF STEEL WORKERS' ORGANIZING COMMITTEE v. INDUSTRIAL COMMISSION et al.

Nos. 6439, 6440.   Decided June 18, 1943.   (139 P. 2d 208.)

See 39 Corp. Jur., Master and Servant, sec. 57; Am. Jur., Social Security, etc.

*George W. Worthen,* of Provo, for plaintiffs.

*Grover A. Giles,* Atty. Gen., and *A. M. Ferro, Stephens, Brayton & Lowe, L. H. Callister, J. Henri Henriod,* and *Richard J. O'Rourke,* all of Salt Lake City, for defendants.

McDONOUGH, Justice.

After a writ of review was issued in each of the above-entitled cases, No. 6439 and No. 6440, by stipulation of counsel for the respective parties, the two cases were consolidated for purposes of further proceedings. The writs, were issued to review the orders of the Industrial Commission of Utah which affirmed the decisions of the Appeals

Referee whereby the petitioners were denied unemployment compensation for the days they were out on strike between July 15, and August 19, 1941. The strike was called by the Steel Workers' Organizing Committee, Local No. 1654. The following facts are undisputed:

The Iron Workers' Union of Provo, Utah, and the Steel Workers' Organizing Committee, Local No. 1654, a CIO affiliate, are rival unions which have recruited employees of the Pacific States Cast Iron Pipe Company. The Iron Workers' Union defeated the CIO in an election in 1939, and was made the bargaining agent. A contract between the corporation and the Iron Workers' Union was executed on August, 9, 1939. On February 29, 1940, the CIO Steel Workers' Organizing Committee, hereinafter called the S. W. O. C., won the consent election and became the sole bargaining agent of the employees.

Subsequent to such election, the S. W. O. C. requested the corporation to enter into negotiations. A series of conferences and oral discussions took place; proposals and counter proposals between the S. W. O. C. and the company were submitted and discussed; but the parties did not reach an agreement. Charges of unfair labor practices were filed before the National Labor Relations Board against the corporation by the S. W. O. C., among which charges it was alleged that the company had not bargained in good faith and that it had discriminated against members of the complaining union. A representative of the National Labor Relations Board commenced a hearing of such charges on April 7, 1941, and he filed an intermediate report on June 24, 1941, a copy of which was received in Provo about July 7, 1941, two days before balloting on a proposal to strike was conducted. The trial examiner for the National Labor Relations Board concluded that the corporation was guilty of unfair labor practices, in that it had discriminated against a member of the S. W. O. C. because of his union affiliations, had stalled in negotiations with the union, and had not bargained in good faith.

Prior to the filing of the report of such trial examiner, negotiations and collective bargaining conferences between the S. W. O. C. and the employer corporation were re-opened. During the latter part of May, 1941, a representative of the union submitted a proposed contract to the company and a conference was held on June 5, 1941, at which time the union representatives interpreted the various provisions and stated their reasons for the particular proposals. The form of contract proposed by the union was objected to by the company. On June 12, 1941, a conference was held at which the employer submitted counter proposals and interpreted them. Owing to the fact that the company had objected to the form of contract proposed by the S. W. O. C., it was agreed between the parties that the form of contract be held in abeyance until an agreement could be reached on other matters. A meeting was called for June 19th, and a new wage proposal submitted by the company was discussed. No agreement being reached, the company officials were told by the S. W. O. C. representatives that unless they came to a satisfactory agreement with the union very soon, a strike would be called to close the plant until an agreement was signed. The company agreed to furnish figures and information to show how the new proposal would operate as to bonus rates.

On July 3, 1941, there was another meeting, at which time a new form of bilateral contract was submitted by the union. It was not discussed very thoroughly as the company officials accused the union officials of resubmitting the old form of contract which had resulted in a dead-lock during the previous year. One of the attorneys for the company suggested that the parties take a few days to think things over, and see if they could propose something new and different. No further meeting date was set.

Upon receipt of the intermediate report of the trial examiner for the N. L. R. B., a meeting was called by the S. W. O. C. for July 9th. Between July 7 and 15, 1941, mem-

bers of said union circulated two hand bills, one of which read as follows:

"Are You Familiar With the Cases the Mediation Board Has Settled?

"Labor has made considerable gains through decisions rendered by this board.

"Shall we take advantage of this mediation offer of the Government of the United States?

"It is up to You

"Attend one of the Mass Meetings where these issues will be explained to you"

The other hand bill read as follows:

"Are we going to continue to Back Down on the meager demands we have made on the company?

"Are they always going to get by with the stalling off method they have repeatedly given us?

"Will they scare you into accepting a cheap scheme whereby your wages will definitely be reduced to and below the level of April 1941?

"Or

"Would you like to have the Mediation Board from Washington called in to help draw up a fair working agreement, which they are willing and ready to do?

"If so, stand firm on your conviction that we have backed down far enough."

The intermediate report of the trial examiner for the N. L. R. B. was discussed at the union meeting on July 9th. At that meeting a strike vote was taken by the members, and on July 10, 1941, a letter was addressed to the company which stated that by a vote of 219 to 10 the union voted to strike on July 15, 1941, unless the company offered a satisfactory agreement to the union by that time.

The Department of Labor sent a request to the union prior to July 15th in which it requested the union to postpone the strike until Mr. Meyers of the Conciliation Service could arrive; that he would arrive on the 16th—the day following the time when the men were ordered by the union

to strike. Mr. Knerr, chairman of the Industrial Commission of Utah, communicated with the union strike committee suggesting that the strike call be postponed to enable a representative of the Conciliation Service to meet with the union representatives and the company to aid in ironing out their differences. On July 15, 1941, at about 9 p. m. representatives of the strike committee at the request of Mr. Knerr, met with company representatives with a view to postpone the strike scheduled for midnight. The strike committee refused to yield, and at midnight the men walked out and established a picket line of about 300 men to prevent any workmen other than maintenance and repair men and officials from entering the plant.

The strike ended on August 19, 1941. Members of the S. W. O. C. union filed applications for unemployment compensation, claiming the strike was due to the failure and refusal of the employer to conform to the provisions of the laws of the United States pertaining to hours, wages, or other conditions of work. The members claimed the employer had persistently failed and refused to bargain collectively with their bargaining agent, the Steel Workers' Organizing Committee, Local No. 1654. Members of the rival Iron Workers' Union who applied for compensation claimed they were entitled to unemployment benefits even if the strike was not a result of any unfair labor practice on the part of the company, for the reason that they had no voice in calling the strike and were prevented by an effective picket line from going into the plant to work. They also alleged they were not of the same group or class which called or caused the strike.

The principal claims examiner for the department of Employment Security, conducted an investigation of the claims, but without any hearing. On July 31, 1941, he made his report in which he stated that all of the applicants were entitled to unemployment compensation during the period the men were out on strike. The matter was then referred to the appeal referee for the State Industrial Com-

mission, who conducted a hearing on the matters commencing August 11, 1941. On September 11th the appeal referee entered findings of fact and a decision whereby he set aside the decision of the claims examiner, and entered an order denying both groups of applicants any unemployment compensation. The applicants then appealed to the Industrial .Commission of Utah, which affirmed the decision of the appeal referee.

If the members of the S. W. O. C. are entitled to unemployment compensation, it is not necessary to consider the special arguments advanced by the Iron Workers' Union. The claims of members of the S. W. O. C. will be first considered. The basis of their attack on the decision of the appeal referee (which became the decision of the Industrial Commission), is that said referee erred as a matter of law in concluding that the strike "was not caused by the failure or refusal of the Pacific States Cast Iron Pipe Company to conform to the provisions of any law of the State of Utah or of the United States pertaining to hours, wages, or other conditions of work, within the meaning of Section 5(d) (1) of the Utah Employment Security Act." They contend that the decision of the Industrial Commission "is not supported by sufficient or substantial evidence, or any evidence, that petitioners were the parties causing the stoppage of work," and they allege "that the record clearly shows the stoppage of work was caused by the company's refusal to bargain in good faith."

If there is substantial competent evidence to sustain the findings and decision of the Industrial Commission, this court may not set aside the decision even though on a review of the record we might well have reached a different result. Laws of Utah 1941, Chap. 40, Sec. 10(i) (Sec. 42-2a-10(i), U. C. A. 1943). Counsel for the S. W. O. C. argue at great length that the record compels a finding that the stoppage of work was not the result of a strike fomented by a group of workers, but that the strike was caused by the failure or refusal of the company

to conform to the provisions of the laws of the state of Utah or the United States "pertaining to hours, wages, or other conditions of work", through its alleged refusal to bargain in good faith. During the hearing, over the objections of the company, the S. W. O. C. was permitted to introduce in evidence the intermediate report of the trial examiner for the National Labor Relations Board, which recites that the company was guilty of unfair labor practices. By its brief the S. W. O. C. cites findings of the National Labor Relations Board dated June 4, 1942, to the effect that the company had been guilty of unfair labor practices by refusing to bargain with the CIO union, and that "when these negotiations were unsuccessful a strike was called on July 15, 1941."

We are unable to see how any findings made by a trial examiner for the National Labor Relations Board or even by the board itself, could be binding on the appeal referee or on the Industrial Commission in any hearing or investigation to determine whether applicants are eligible for unemployment compensation benefits; nor do we see how such findings could operate to preclude the appeal referee for the Industrial Commission or the commission itself from conducting a complete and independent hearing. Section 5(d) (1), Employment Security Act of 1941, Chap. 40, Laws of Utah 1941 (Sec. 42-2a-5(d) (1), U. C. A. 1943), directs an investigation to be made by the commission or its appeal tribunal, not merely to determine whether there has been some unfair labor practice, but for the purpose of ascertaining whether or not such unfair labor practice caused the strike for which the applicants seek unemployment compensation. In other words, in order to determine whether the strike has merely been fomented by some employee or employees of the grade or class of applicants, or whether the strike has been caused by some failure or refusal of the employer to conform to the provisions of the law, a fair and impartial hearing must be conducted by or on behalf of the Industrial Commission on the various applications for unemployment benefits.

We come then to the determination of the question as to whether there is in the record any competent and substantial evidence to support the findings, conclusions and decision of the appeal referee who acted as the appeal tribunal. Apart from the undisputed evidence hereinabove related, there was considerable dispute and a conflict in testimony as between witnesses who testified for the S. W. O. C. and those who testified on behalf of the company. Some who testified on behalf of the company claimed they made detailed notes of the proceedings and negotiations for collective bargaining, while those who testified on behalf of both the unions relied entirely on memory. Some witnesses for the unions retracted on cross-examination some of their original statements.

The appeal referee had to choose between the testimony of witnesses for the S. W. O. C. and the testimony of the company witnesses. Some apparent conflicts in testimony were reconciled by qualifying answers on cross-examination. The final determination of the claims after hearing, constituted findings and decision by the appeal tribunal and affirmed by the Industrial Commission, to the effect that the strike was not caused by any failure or refusal of the employer to comply with the provisions of the state statutes or federal laws. From a review of all the evidence, we are not able to say that the appeal referee or the commission could not properly have reached the conclusion actually reached on the issue of the cause of the strike. There was material, substantial and competent evidence introduced to justify the findings and conclusions. The S. W. O. C. applicants therefore cannot prevail.

The members of the Iron Workers' Union contend that they are entitled to benefits for the time they lost by reason of the strike, even if the members of the S. W. O. C. cannot collect any benefits. They point out that they were not permitted to vote on the strike; that they had nothing to do with calling it, but that they were prevented from entering the plant by an effecive picket line. They further contend.

that they were not of the grade, class, or group of workers which was involved in the strike because they had no voice in negotiations and had no voice in determining whether or not there would be a strike. In fact they claim they were opposed to the strike and should not be penalized by the acts beyond their control.

However, it must be remembered that the S. W. O. C. by virtue of winning the consent election became the sole bargaining agent for all of the employees, including members of the Iron Workers' Union. Section 5 of the statute provides:

"An individual shall be ineligible for benefits or for purposes of establishing a waiting period:

\* \* \*

"(d) For any week in which it is found by the commission that his unemployment is due to a stoppage of work which exists because of a strike involving his grade, class, or group of workers at the factory or establishment at which he is or was last employed.

"(l) If the commission, upon investigation, shall find that a strike has been fomented by a worker of any employer, none of the workers of the grade, class, or group of workers of the individual who is found to be a party to such plan, or agreement to foment a strike, shall be eligible for benefits; provided, however, that if the commission, upon investigation, shall find that such strike is caused by the failure or refusal of any employer to conform to the provisions of any law of the state of Utah or of the United States pertaining to hours, wages, or other conditions of work, such strike shall not render the workers ineligible for benefits."

In our opinion there can be no question as to the fact that the strike involved the "grade, class, or group of workers" at the factory or establishment at which members of the Iron Workers' Union were employed, and to which "grade class, or group" they belonged. The strike was not called to affect S. W. O. C. members only; it was called to shut down the operations of those departments in which S. W. O. C. members were working, whether all employed were members or not. Membership in the S. W. O. C. was not limited to a certain kind or kinds of

employees of the plant. The same is true as to membership in the Iron Workers' Union. The election held was to determine which union should represent the whole group. The workers at the plant, insofar as the results of the labor dispute would affect them, constituted a single group. We are not here confronted with a situation in which there are several groups or classes or grades of workers in a plant, one of which engages in a labor dispute with an employer and as a result such group strikes to enforce its demands. In such case the striking employees have constituted themselves a class or group to achieve results for themselves. The other workers at the plant, though they may be unable to work would not be ineligible for unemployment compensation, because the stoppage of work by the group in question necessitates closing the plant. Such non-striking employees forced out of work would constitute a group not "involved" in the strike within the meaning of the statute.

Appellant Iron Workers argue that by having no voice in calling the strike and not being participants therein they segregated themselves from the striking "group" by their action and thereby became a group or class separate from the strikers, who were not "involved" in the strike. Such argument fails to take into account the fact that as a result of the election referred to the union calling the strike legally represented the entire group of which the Iron Workers were a part; and that the action of the S. W. O. C. in calling a strike definitely "involved" them in the strike since it was their bargaining agent. The action of their bargaining representative was their action, quite as much as it was the action of the minority of the membership of the S. W. O. C. who voted against the strike.

If a strike involves his "grade, class, or group" of workers, an employee is ineligible to unemployment benefits when stoppage of work is "caused" by members thereof. The words "grade" and "class" have reference generally to the type of work being performed, as to skills or as to expertness in those skills. The word "group" may be synonymous in a given instance with "class

or grade," but it may include several classes or grades or even involve the workers of an entire plant. A strike involves the "grade, class, or group" of an employee within the meaning of the statute if the dispute which results in the strike is with reference to wages, hours or conditions of employment of a group of which he is a member. True, a "class, grade or group" may be coextensive with a particular union membership, but this not necessarily so. In the instant case the members of the Iron Workers' Union were dissident members of a "group" involved in the strike; nevertheless they were members of the "group" which was involved in the strike. The provisions of (d) (1) hereinabove quoted, providing that where a strike is fomented by an employee, the workers who are of his "grade, class, or group" are ineligible for benefits serves to make clear that the construction here given of the quoted words voices the legislative intent. It is not only those who foment the strike or bring it about who are ineligible, but the group to which such persons belong—however inclusive—the group for whose benefit the strike is called.

We have examined the cases cited by the petitioners. In *Kieckhefer Container Co.* v. *Unemployment Compensation Commission et al.*, 125 N. J. L. 52 and 55, 13 A. 2d 646 and 648, the applicants for unemployment benefits did not participate in the strike. In the one case it was determined that the "production workers" caused the strike. It was also determined in each of the two cases that the applicant was not and could not properly be classified as a "production worker" or be considered a member of such group.

The case of *Huiet* v. *Boyd*, 64 Ga. App. 564, 13 S. E. 2d 863, likewise does not aid petitioners. In that case the applicants did not vote for the strike and they were not members of the union which called the strike. They claimed it was impossible for them to go through the picket line with any degree of safety. They claimed they were not members of any group or class which consented to the strike, but that they were in the group which opposed it.

The statute grants an exemption from the general disqualifying provisions applicable to persons out of employment by reason of a strike, to those who are not directly interested in or participating in or financing the strike, and who do not belong to a grade or class of workers, any of whom participate in, or finance, or are directly interested in the dispute. The Georgia Court of Appeals held that there was sufficient evidence to show that claimants were disqualified to receive benefits because they were interested in the outcome of the strike by reason of the bearing it had on wages of claimants. The court held it was immaterial whether they were members of any union.

The case of *Department of Industrial Relations* v. *Drummond*, 30 Ala. App. 78, 1 So. 2d 395, does not involve interpretation of the terms "class, group or grade," as suggested by petitioners, but only the meaning of "stoppage of work due to a labor dispute." The majority of the court held that if the applicant did not actually participate or was not in any way a party to the dispute, and the employer shut down the mine in order to prevent violence, applicant was entitled to compensation. That case is not in point here. The applicant was a member of the A. F. of L. union while the applicant in the companion case was a member of the C. I. O. union. See *Department of Industrial Relations* v. *Pesnell*, 29 Ala. App. 528, 199 So. 720; certiorari denied by Supreme Court of Alabama, *Ex parte Pesnell*, 240 Ala. 457, 199 So. 726.

In *Bodinson Mfg. Co.* v. *California Employment Commission*, 17 Cal. 2d 321, 109 P. 2d 935, 938, the question was whether the applicant "left his work because of a trade dispute." Striking welders established a picket line through which applicant and others declined to go. It appears there was only peaceful picketing and no threat of any kind. The Supreme Court of California held that if the applicant was not physically prevented from working, but he merely exercised the choice of following union principles by not going through the picket line, he was not out of work involun-

tarily and he was not eligible for unemployment compensation. *In re Persons Employed, etc.*, 7 Wash. 2d 580, 110 P. 2d 877, the court held that inasmuch as members of the union which did not call a strike agreed not to go through a picket line established by another union, they were thereby participating in a labor dispute, and that there was no need for determining whether or not applicants were of the same "class" of workers as the strikers or whether they were employed in a separate unit of the company.

In this case, the exceptions were not found to be applicable, and for that reason the applicants were declared to be ineligible for unemployment compensation. The decision of the Industrial Commission affirming the findings and decision of the appeal referee with respect both to the members of the Iron Workers' Union and the Steel Workers' Organizing Committee, is supported by the evidence and indicates no misapplication of the law. Each of said decisions is therefore affirmed.

LARSON and MOFFAT, JJ., and WILL L. HOYT and J. ALLAN CROCKETT, District Judges, concur.

WOLFE, C. J., having disqualified himself, CROCKETT, District Judge, participated.

PRATT, J., on leave of absence.