## OLOF NELSON CONST. CO. et al. v. INDUSTRIAL COMMISSION et al.

No. 7633.   Decided April 29, 1952.   (243 P. 2d 951.)

See 39 C. J., Master and Servant, sec. 369. Refusal to work because of strike as involuntary unemployment within social security provisions. 48 Am. Jur., Social Security. Unemployment Insurance and Retirement Funds, sec. 36; 173 A. L. R. 490.

*Clyde, Mecham & White,* Salt Lake City, for plaintiffs.

*Louis H. Callister,* Salt Lake City, for Industrial Relation Council Amicus Curiae.

*Clarence M. Beck* and *Reid W. Nielson,* Salt Lake City, for Utah State Federation of Labor Amicus Curiae.

*Clinton D. Vernon,* Atty. Gen., *Fred F. Dremann, A. W. Sandack,* Salt Lake City, for defendants.

WOLFE, Chief Justice.

Certiorari to review a decision of the Board of Review of the Industrial Commission, awarding unemployment compensation to defendant claimants. Plaintiffs are members of the Associated General Contractors of America, Intermountain Branch, commonly termed the "A. G. C." This association is composed of approximately 75 general contractors who are engaged in general building, highway and heavy construction business in the State of Utah. The 75 members employ in excess of 5,000 employees. The eight individual defendants are representative claimants of the 5,000 who became unemployed as a result of a labor dispute between the unions and the A. G. C. All employees are members of one of the Six Basic Craft Unions, affiliated

with the American Federation of Labor, namely: (1) International Hod Carriers, Building and Common Laborers Union, (2) United Brotherhood of Carpenters and Joiners of America, (3) International Union of Operating Engineers, (4) International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, (5) International Association of Bridge, Structural and Ornamental Iron Workers and (6) Operative Plasterers and Cement Finishers International Association.

From 1922, when the Intermountain Branch of A. G. C. received its charter, until 1941, very little collective bargaining was conducted between the Six Basic Craft Unions and the individual contractors or with A. G. C. From 1941 to 1945, wages in the State of Utah, as elsewhere in the United States, were frozen as a result of the war. However, during the war years, certain inequities were ironed out and changes were made in wage rates and wage classifications through the mutual efforts of the Association and each of the Six Basic Crafts. In 1945, the Labor Committee of the Association and the International Union of Operating Engineers negotiated a state-wide collective bargaining agreement embracing the working rules and wages and wage classifications for that particular craft. The following year, master state-wide labor agreements were negotiated between the Association and the Six Basic Crafts individually. These agreements were negotiated and executed by the Labor Committee of the A. G. C. for and on behalf of all members of the Association. By 1948, the scope of collective bargaining in the industry had expanded to include all the Six Basic Crafts into one combined master labor agreement with the A. G. C. This wage contract was binding only on those contractors who signed it or granted the Labor Committee power of attorney to do so for them.

In 1949, a similar state-wide master contract was executed between the Unions and the A. G. C. This agreement was to run until June 1, 1951 with a reopening clause for wages only, June 1, 1950. Individual members of the Assoc-

iation became signators to the agreement subsequent to its execution, thereby binding their respective construction companies. Since 1945, all contracts expressly provided that the Six Basic Crafts and the Labor Committee of A. G. C. recognize each other as the collective bargaining representative of its members. Thus, employers as a unit and employees as a unit have successfully bargained for several years through their respective agencies.

On February 27, 1950, the Secretary of the Building Trades Council, representing the Six Basic Crafts, advised the Association by letter of the Union's desire to open the wage provision of the '49-'51 contract and revise the wage rates upward. A series of meetings between the A. G. C. Labor Committee and the Six Basic Crafts were unsuccessful in arriving at a new wage scale. On May 18th, the Association directed a letter to the Secretary of the Building Trades Council and each of the Six Basic Crafts stating

"that a strike against any individual contractor who is a signator [to the agreement] will be regarded as a strike against all."

The Union's reply was that they did not concur in this position taken by the employers. The parties remained deadlocked until the June 1st deadline. The Secretary of the Building Trades Council then notified the Association that pickets would be assigned to the Ellis W. Barker Professional Building job in Salt Lake City and the Earl S. Paul job in Ogden. A strike vote had been obtained and picketing commenced at those two places on Friday, June 2nd. By Monday afternoon, June 5th, the A. G. C. members who were signators to the labor agreement, numbering approximately 70 members and affecting some 5,000 workmen, closed down their construction projects and laid the men off those jobs. The construction companies shut down as a result of their united action to consider a strike against one a strike against all.

Negotiations between the Labor Committee of the Association and the representatives of the Six Basic Crafts were resumed on June 6, 1950 and on June 7th a satisfac-

tory agreement was reached establishing a new wage scale and extending the life of the labor contract to June 1, 1953. The picketing ceased the evening of June 7th and all workmen returned to their jobs June 8, 1950. None of the claimants involved in this case were employed by the two employers whose jobs were struck. They were employed by the A. G. C. members who shut down their operations pursuant to the prearranged strategy to retaliate by lockout against any strike that might be directed at an individual member's construction project. The claimants duly reported for work until their respective employers shut down their operation.

The issue involved is whether the claimants should be disqualified from receiving unemployment compensation benefits under the provisions of Section 42-2a-5, Utah Code Annotated, 1943. The statute provides:

"An individual shall be ineligibale for benefits or for purposes of establishing a waiting period: * * *

"(d) For any week in which it is found by the commission that his unemployment is due to a stoppage of work which exists because of a strike involving his grade, class, or group of workers at the factory or establishment at which he is or was last employed.

"(1) If the commission, upon investigation, shall find that a strike has been fomented by a worker of any employer, none of the workers of the grade, class, or group of workers of the individual who is found to be a party to such plan, or agreement to foment a strike shall be eligible for benefits * * *."

The defendants contend that the facts make it clear that there was no strike at any of the operations other than the two at which pickets were established and therefore the claimants were not ineligible to receive unemployment compensation benefits. All italicized portions of this opinion are the emphasis of the author.

The Appeals Referee ruled that the claimants were not on strike, that the stoppage of work *was not due to a strike at the factory or establishment where the individual was*

*last employed.* Consequently, benefit payments were allowed for the period in question. In accordance with Section 42-2a-10(d), Laws of Utah 1949, the decision of the Appeals Referee was appealed to the Board of Review of the Industrial Commission. Such Board of Review ruled:

"In view of the fact that there have been two previous decisions [claims supervisor and appeals referee] it is the decision of this Board of Review that any further hearing on appeal be and is hereby denied".

The plaintiff contractors, as employer contributors under the Employment Security Act then commenced an action in this court against the Board of Review to secure judicial review of its decision. Section 42-2a-10(i), Laws of Utah 1949; Rule 72(c), Utah Rules of Civil Procedure.

Defendants' claim to compensation is based upon its contention that the correct interpretation of our disqualification provision is that the claimant is ineligible for benefits when his unemployment (stoppage of work) is *caused by a strike at the factory or establishment where he was last employed.* The statute conveys an equally plain meaning when interpreted to state that the claimant is ineligible when he is unemployed because a stoppage of work exists due to a *strike which involves his grade, class or group* of workers. The Appeals Referee ruled in accordance with labor's contention,—that the claimant's eligibility is dependent upon whether or not the strike existed at his place of employment. This interpretation makes the geographical location or existence of the strike the determinative factor governing payment of unemployment benefits. The Associated General Contractors maintain that such an interpretation was not intended by the Legislature, that unemployment benefits should not be paid where a strike *involves* the grade, class or group of workers of which claimant is a member. It is fair to state that our 1935 and 1936 Legislature probably did not consider the language chosen with respect to the fact situation now presented before us. Multi-

employer bargaining units were not in operation at that time. But the legislative intent to determine the eligibility of claimants for unemployment compensation does not seem to limit the disqualification provision to cases where strikes exist at the particular factory or establishment where claimant was employed. The contrary view seems more clearly expressed. The original provision passed in 1935 stated:

"An employe shall not be entitled to benefits: * * * (3) If he has left or lost his employment due to a trade dispute *involving* the employer by whom he was employed, so long as such trade dispute continues; * * *." Ch. 38, Section 8(3), Limitation on Payment of Benefits, Laws of Utah 1935. (Emphasis added.)

The following year the statute was amended to read:

"An individual shall be ineligible for benefits: * * * (d) For any week in which it is found by the commission that his total or partial [total or partial, now deleted] unemplofment is due to a stoppage of work which exists because of a strike involving his grade, class, or group of workers at the factory or establishment at which he is or was last employed."

Subdivision (1) was then added, which provides:

"If the commission, upon investigation, shall find that a strike has been fomented by a worker of *any employer,* none of the workers of the grade, class, or group of workers of the individual who is found to be a party to such plan, or agreement to foment a strike, shall be eligible for benefits; * * *." Ch. 1, Sec. 5, Disqualification for Benefits, Laws of Utah, Special Session 1936.

We do not believe that the amendment in 1936 was intended to change the fundamental theory of disqualification stated in the 1935 act. The amendment was designed to refine and clarify the disqualification provision. Expression of this theory of ineligibitly was no easy matter. The emphasis in the original provision is that no benefits were to be paid where the unemployment was due to a trade dispute involving the employer of the claimant. The 1936 amendment substituted the words: "Stoppage of work which

exists because of a strike" for "trade dispute" and "involving his grade, class, or group of workers at the factory or establishment at which he is or was last employed" for "involving the employer by whom he was employed". It makes no difference whether the principle of disqualification is expressed in terms, relating to the employer or the employee. In order to have a trade dispute involving the employer, or a strike involving the grade, class or group of workers, there must exist an employment relationship. In both the 1935 and 1936 versions of disqualification, it is the temporary termination of the employment relationship which is being described. The purpose of adding subdivision (1) was to make it clear that the meaning of the 1935 act was not to be changed. Benefits were not to be paid where a strike or trade dispute involved either the employer or the grade, class, or group or workers at their place of employment, in such a way as to cause the unemployment or work stoppage. None of the workers of the grade, class or group of workers of the individual who is found to be a party to such plan or agreement to foment a strike shall be eligible for benefits.

This construction of these two provisions, 42-2a-5 (d) and (d) (1) is consistent with the interpretation given them in *Members of Iron Workers' Union of Provo* v. *Ind. Comm.*, 104 Utah 242, 139 P. 2d 208. In that case, the Iron Workers' Union was defeated in an election which certified the rival Steel Workers Organizing Committee (S. W. O. C.) as the bargaining agent at the Pacific States Cast Iron Pipe Co. The S. W. O. C. called a strike. Although the members of the Iron Workers' Union did not participate in the strike vote, they refused to cross the picket line and subsequently sought unemployment compensation benefits. Mr. Justice McDonough, speaking for this court, at page 252 of 104 Utah, at page 212 of 139 P. 2d, stated:

"If a strike involves his 'grade, class, or group' of workers, an employee is ineligible to unemployment benefits when stoppage of work is 'caused' by members thereof. The words 'grade' and 'class'

have reference generally to the type of work being performed, as to skills or as to expertness in those skills. The word 'group' may be synonymous in a given instance with 'class or grade', but it may include several classes or grades or even involve the workers of an entire plant. A strike involves the 'grade, class, or group' of an employee within the meaning of the statute if the dispute which results in the strike is with reference to wages, hours or conditions of employment of a group of which he is a member. * * * The provisions of (d) (1) hereinabove quoted, providing that where a strike is fomented by an employee, the workers who are of his 'grade, class, or group' are ineligible for benefits serves to make clear that the construction here given of the quoted words voices the legislative intent. *It is not only those who foment the strike or bring it about who are ineligible, but the group to which such persons belong—however inclusive—the group for whose benefit the strike is called."* (Italics added.)

In the present case the Six Basic Craft Unions bargained together as one group with the Labor Committee of the A. G. C. In view of the history of the negotiations between these two groups, the bargaining unit is the "group involved" in this case.

Defendants admit that a labor dispute existed which concerned all A. G. C. employer-members and their employees belonging to one of the Six Basic Crafts. There is no doubt that the union's objective in striking the two jobs was to apply economic pressure to assist the bargaining representatives of the Six Basic Crafts in obtaining an industry-wide wage raise. The unions were successful in this strategy. But defendants argue that the work stoppage must exist because of a strike and in this case it was not caused by the strike, but by the employer-instigated lockout. This requires a determination of the fundamental issue in this case—what caused the work stoppage and resulting unemployment?

Six briefs have been filed in this action citing numerous cases from other jurisdictions and arguing many propositions and distinctions bearing upon this problem. These cases are helpful, but each opinion in the cited case is con-

cerned with the particular statutory language of the act there under consideration. Two well reasoned cases concerning the same fact situation as we have here before us, reaching opposite results, are *Bucko* v. *J. F. Quist Foundry Co.*, 229 Minn. 131, 38 N. W. 2d 223, and *McKinley* v. *California Employment Stabilization Commission*, 34 Cal. 2d 239, 209 P. 2d 602. In the *Bucko* case, several Minneapolis employers operating foundries, associated themselves together to form a multi-employer bargaining unit. When the union struck one foundry during a labor dispute, the other association members carried out their prior intention of considering a strike against one as a strike against all and retaliated by locking out their employees. The Supreme Court of Minnesota upheld the decision granting unemployment compensation to those men who had been locked out. The court stated that the fact that a strike was called against three employers did not compel the other nine to close their shops and though a labor dispute existed in all establishments,

"it cannot be said that unemployment in the nine establishments was due to anything but the lockout." [229 Minn. 131, 38 N. W. 2d 235.

The Minnesota statute provided that an individual shall be disqualified for benefits if his unemployment is found to be due to

"a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed. * * *"

The statute more specifically stated,

"Nothing in this subsection shall be deemed to deny benefits to any employee who becomes unemployed because of a lockout * * *." 1943 Minn. Session Laws, c. 650, § 5, subd. F, M. S. A. § 268.09, subd. 1(6).

The California view expressed in the *McKinley* case was derived from two prior decisions. In *Bodinson Mfg. Co.* v. *California Employment Commission*, 17 Cal. 2d 321, 109

P. 2d 935, 940, the court held that members of a machinist's union who refused to cross the picket line of the welder's union established at the plant where both groups worked, were ineligible for unemployment compensation. This decision is cited and relied upon by this court in *Lexes* v. *Ind. Comm.*, 121 Utah 551, 243 P. 2d 964. The *Bodinson* case established the fundamental theory that disqualification for benefits "depends upon the fact of voluntary action" by the claimant. Subsequently, *Bunny's Waffle Shop* v. *California Employment Comm.*, 24 Cal. 2d 735, 151 P. 2d 224, 227, was decided in which case the reverse situation to the facts of the instant case occurred. An association of restaurant owners sought to compel their employees to recognize the multi-employer unit as the bargaining agency for each individual employer, by reducing wages 25% and establishing a six-day week split shift instead of a five-day week straight shift. The employees left their jobs rather than accept the reduced wage scale. The court in determining that the employees were not ineligible for unemployment benefits because of the trade dispute stated:

"The economic weapon in the present case was created by the employers and directed against their employees, and it alone, rather than the trade dispute that occasioned it, was the cause of the leaving of work."

Thus the court stated in the *McKinley* case, at page 605 of 209 P. 2d, commenting on the *Bunny's Waffle Shop* decision,

"* * * that, in reality, the form of the cessation of employment is not controlling and the determinative factor is the volitional cause of the work stoppage. In other words, although the employees left work of their own choice, that choice was not freely made but was compelled by the economic weapon which the employers used. This is the only sound and fair way to apply the subjective volitional test stated in *Bodinson Mfg. Co.* v. *California Employment Comm.* * * *."

In *McKinley* v. *California Employment Stab. Comm.*, supra, the employer association comprised all of the Sacra-

mento Machine Shop baking industry. The Bakery and Confectionary Worker's Union struck the Butter Cream Plant, a member of the association. The association carried out their prearranged plan of retaliating against the strike by an association-wide lockout. The California disqualification provision reads:

"An individual is not eligible for benefits * * * (a) If he left his work because of a trade dispute and for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed." Gen. Laws Cal. Act. 8780d, § 56.

The court stated at page 606 of 209 P. 2d:

"At no time did the union purport to be directing any action solely against the Butter Cream plant; instead, the union continued throughout to deal directly with the association for the purpose of obtaining a new master contract. To say, therefore, that the act of striking the one plant did not shut down work in other plants of the association which were subject to the labor negotiations for the purpose of obtaining a master contract is wholly unrealistic. Industry-wide negotiations had been established by these employers and consistently carried on for over 10 years."

Other quotations which emphasize the California position are:

"It seems clear that under such industry-wide, single contract negotiation, economic action by either side, whether strike or lockout, would be considered by each of the parties as action against the entire group struck or locked out. * * * The selection of a certain plant or plants for a shut-down by strike at a particular time was a mere matter of strategy in the conduct of the trade dispute which equally involved all of the bakeries and their employees. This, in effect, applied the union's economic sanctions against each employer and brought about the unemployment of all of its members. Had the association acted first by closing down one of the members plants and the union followed with a strike against all of the remaining plants, it would be equally clear that the volitional act causing unemployment was the initial shutdown."

Thus, as Mr. Justice Schauer stated in his concurring opinion at page 608 of 209 P. 2d the court held

*"that it was proper to relate responsibility for the work stoppage to the party who created its actual and directly impelling cause."*

Another important decision bearing upon the right of the A. G. C. to consider a strike against one as a strike against all is that of *Morand Bros. Beverage Co.* v. *National Labor Rel. Bd.*, 7 Cir., 190 F. 2d 576. In that case the employer bargaining unit was the Illinois and the Chicago Wholesale Liquor Dealers' Association. When negotiations for a labor agreement with the Liquor Wine Salesmen's Union reached an impasse, the union struck the Old Rose Distributing Co. The association carried out its preconceived plan, known by the union, of opposition to any strike by a concerted association-wide lockout. An unfair labor practices complaint was filed against the members of the association, charging them with the discriminating discharge of their salesmen. The National Labor Relations Board affirmed the decision of the Trial Examiner which held that the action of the employers in retaliating against the strike by the use of the lockout constituted an unlawful discrimination on the part of the employers against their employees. In reversing this position, Judge Swaim of the Seventh Circuit Court of Appeals, at page 582 of 190 F. 2d stated:

"Concluding, then, that the Union, unable to agree with the Associations upon a satisfactory contract, had a right to strike against Old Rose, or, for that matter, any or all of the Associations' members, it becomes important to determine what retaliatory measures were available to petitioners. Old Rose, of course, had a clear right to replace its striking employees. *National Labor Relations Board* v. *Mackay Co.*, 304 U. S. 333, 345, 58 S. Ct. 904, 82 L. Ed. 1381. The other petitioners, we believe, could quite properly and realistically view the strike, as they did, as a strike which, though tactically against but one petitioner, was, in the strategic sense, a strike against the entire membership of their Associations, aimed at compelling all of them ultimately to accept the contract terms demanded by the Union. * * * Consequently, once petitioners had exhausted the possibilities of good faith collective bargaining with the Union through their Associations, any or all of them were free to exercise their right to lock out their salesmen without waiting

for a strike, just as the Union was free to call a strike against any or all of them."

As we pointed out in the *Lexes* case, the declared policy of the Unemployment Reserve Law, as it was called in 1935, is to establish

"financial reserves for the benefit of persons unemployed through no fault of their own."

The provisions of the statute disqualifying employees from unemployment compensation is to prevent workers from obtaining benefits when there is work available which they decline to accept. Thus the individual is ineligible for benefits, 42-2a-5, U. C. A. 1943:

"(a) For the week in which he has left work voluntarily without good cause  *  *  *.

"(b) For the week in which he has been discharged for misconduct *  *  *.

"(c) If the commission finds that, being unemployed and otherwise eligible for benefits, he has failed, without good cause, either to apply for available, suitable work when so directed by the employment office or the commission or to accept suitable work when offered him  *  *  *.

"(d) For any week in which it is found by the commission that his unemployment is due to a stoppage of work which exists because of a strike involving his grade, class, or group of workers at the factory or establishment at which he is or was last employed."

Our conclusion is that the various disqualification provisions of our Employment Security Act reveal that the underlying legislative intent is for the commission to determine the claimant's eligibility by adhering to the volitional test as announced in the *Bodinson, Bunny's Waffle Shop* and *McKinley* cases in California. The Supreme Court of Minnesota in the *Bucko* case, supra, at page 232 of 38 N. W. 2d stated:

"It is our belief that under our statute, once it is established that the unemployment *is due to a lockout,* the exception to the disquali-

fication applies regardless of whether the employe participates in the labor dispute or not." (Italics added.)

The court then held that the unemployment was not due to the prior strike of the employees but to the subsequent retaliatory lockout. In so holding, the Minnesota court did acknowledge that the issue was a determination of what caused the unemployment.

Our conclusion in this case is that the sounder view is to recognize these large scale bargaining units as the groups involved within the meaning of the Employment Security Act. Their number and scope are increasing. Both labor and management have seen fit to resort to such a device for a uniform, expedient means of negotiating their agreements. There is no dispute that the economic sanction of the A. F. of L. in this case was directed against the entire employer association. The strike was called for and on behalf of every employee covered by the agreement. It therefore directly involved all these claimants, at each particular place of employment at which they were last employed. The strike was fomented by claimants through their duly authorized union representatives. They are members of the group which gained a raise in wages because of the strike and are parties to the scheme or plan to foment it. Therefore they are not entitled to unemployment benefits. The order of the Industrial Commission is reversed. Costs are awarded to the plaintiffs.

McDONOUGH, J., concurs.

CROCKETT, Justice (concurring).

Claimants are not entitled to compensation benefits if they fall under either of the disqualifications set out in Sec. 42-2a-5, U. C. A. 1943:

"(d) If "* * * his unemployment is due to a stoppage of work which exists because of a strike involving his grade, class, or group

of workers at the factory or establishment at which he is or was last employed."

or under Subd. (1): If he is a member of the same grade, class, or group of workers of any employer, any member of which was a party to the plan or agreement to foment the strike.

Under the facts as stated in the main opinion claimants contend that they were unemployed, not because of a

"stoppage of work which exist[ed] because of a strike involving his grade, class, or group of workers"

but they say, on the contrary, they were the victims of a lockout. If the real cause of their unemployment was a lockout, they are entitled to compensation; if it was a strike, they are not. That is the crux of the controversy: Labor contending that the real and immediate cause of the unemployment was the lockout; the employers contending that it was the strike.

The particular problem here involved has never been heretofore presented to the courts of this state. New problems are continually arising in this comparatively new field of the law: labor-management relations. Viewed superficially, this controversy may seem to present an easy solution. Actually, both sides make arguments which seem logically to resolve the matter in their favor. As Mr. Justice Schauer said in the case of *McKinley* v. *Calif. Emp. Stabilization Comm.*, 34 Cal. 2d 238, 209 P. 2d 602, at page 606:

"Were it not for the majority holding in *Bunny's Waffle Shop* v. *Cal. Employment Commission*, 24 Cal. 2d 735, 151 P. 2d 224, a different result might consistently be reached. It may be arguable that a simple and literal interpretation and application * * * might be preferable * * *. But to me the important thing, judicially, is not so much how we interpret section 56 as that, having interpreted it, we shall apply that interpretation fairly and consistently."

After reading numerous cases cited by counsel bearing on the question here, it seems to me that it is essential to go below the surface to the roots of the situation, both to give effect to the intent and purposes of the Employment Security Act, and in order not only to solve the matter at hand but to establish a foundation which will come as close as possible to providing a satisfactory basis for the solution of future controversies of like character, whether the responsibility for work stoppage is upon labor or on management.

The public policy underlying the Employment Security Act as declared by the Legislature is that

"* * * economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people * * *"

and that it is a subject

"* * * which requires appropriate action * * * to prevent its spread and to lighten its burden".

The immediate purpose is to assist the worker and his family in times of unemployment; the secondary and larger purpose is to provide stability for the general economy by assuring constancy of purchasing power. The economic and social welfare of the parties immediately concerned and of society in general are best served by the continuance of employment and the peaceable adjustment of differences in order to keep the wheels of industry moving and to maintain the integrity of the unemployment compensation system.

Labor creates economic wealth by transforming materials into useful forms. If a group of workers produce a given number of units in a given time, whether it be hub caps, chairs or washing machines, the stoppage of their work so that these goods are not made is equivalent to the destruction of the items not so created. Work stoppage is economically the equivalent of the destruction of goods.

Such wasteful and destructive methods of settling disputes are obviously anti-social and undesirable.

In most areas of our social relationships, it has been centuries since men resorted to violence and destruction of each other's property as a means of resolving controversies. It seems manifest that eventually labor disputes will pass beyond the phase of resorting to such destructive proceedures as the strike and the lockout, and disagreements will be settled by some properly constituted authority which the adverse contenders recognize and submit to. When disagreements exist between labor and management, the thing to be encouraged is negotiation and agreement; the economic waste of work stoppage is to be avoided.

It cannot be doubted that the Legislature wanted to prevent strikes in every possible way. Undoubtedly one of the considerations prompting the prohibition against labor receiving benefits for unemployment resulting from a strike it was responsible for is the fact that it would be unfair to use funds built up by labor and management jointly to support labor in a contest wherein it was exerting economic pressure against management by striking. Even more basic is the fact that if such were not the rule, the existence of the system would be hazarded. To permit an employee to become voluntarily unemployed and draw benefits would have these bad effects: It would tend to encourage work stoppage and thus bring about economic waste; and it would put it within his power to voluntarily drain off the Unemployment Compensation Fund and thus hazard its soundness and the accomplishment of its purposes. If it is bad for one worker to be able to voluntarily become unemployed and draw benefits, *a fortiori*, it is proportionately worse for greater numbers and groups to be able to do so. Accordingly, the Legislature has expressed its intent that, when conflicts arise in connection with negotiations between labor and management, unemployment compensation should not be available to support labor

when there is work stoppage, the responsibility for which is chargeable to a strike initiated by labor.

Notwithstanding the foregoing, well established and unquestioned are the rights of labor to organize into unions; to strike; and to maintain picket lines for the purposes sanctioned by law; and by use of the foregoing to use the economic pressures of their collective action in bargaining with management. A necessary corrolary to this is the right of management to organize into multi-unit associations for the purpose of using the economic pressure of their collective action for the purpose of bargaining with labor. See *McKinley* v. *Calif. Emp. Comm.*, supra; *Betts, Cadillac, Olds. et al.* v. *Intl. Ass'n of Machinists*, CCH, NLRB—Decisions 1950-51, par. 11, 109. It should be borne in mind that the decision in the instant case would have no application where the dispute or disagreement is with only one employer of a group. Therefore, defendants' apprehension of its encouraging or causing spread of work stoppage throughout whole industries is not justified. This would not occur unless one side or the other, for pressure, reprisal or other purpose, broadened the dispute to the extent it could properly be considered as involving the whole industry. Here the whole industry was already involved from the beginning and at all times.

In these controversies where we have workers represented by their unions arrayed on one side against management in multi-union bargaining organizations on the other, if we are to give effect to the legislative purpose and intent, the problem simmers down to: Whose conduct is really responsible for the work stoppage? Answering this question may have its difficulties but it seems to be the only logical means of getting at the heart of the matter and resolving the conflict.

Any such rule must be uniformly applied. It cannot be so used as to favor either labor or management, not only because justice requires the application of the rules fairly

and impartially to both sides, but also because, in recurring disputes, labor and management find themselves on opposite sides of this same controversy. Fortunately for our guidance, experience in our sister state of California, has preceded ours.

In the case of *Bunny's Waffle Shop* v. *Cal. Emp. Com.*, 24 Cal. 2d 735, 151 P. 2d 224, the employers had demanded collective bargaining with their newly formed association; this was refused by the unions; there was not literal shutdown or lockout, but the employers reduced wages 25%, ordered split shifts, and a six-day week instead of five to force the unions to bargain with them collectively. The employees refused to accede to these demands and collectively withheld their services, which conduct would have fallen within the literal definition of the word "strike". And it was plausibly argued that it was such. The Commission went below the surface of this collective withholding of services which had the semblance of a strike and recognized that the employers were the first to use their economic pressure in the controversy, saying:

"The economic weapon * * * was created by the employers * * * and it alone, rather than the trade dispute that occasioned it, was the cause of the leaving of work. * * *"

The California Supreme Court affirmed the Commission's holding, basing it upon the fact that the employers were primarily responsible for the work stoppage by initiating the use of the economic weapon in the controversy, because of which fact the employees could not be properly charged with being on strike, and allowed them unemployment compensation benefits.

The reverse of that situation then occurred later in the case of *McKinley* v. *Cal. Emp. Com.*, supra, as discussed in the main opinion. When the dispute arose, the unions struck only one bakery of the employer group. The employers retaliated by using their collective economic pressure, shutting down all the other bakeries. The employees

contended that they were ready and willing to work in the plants until they were locked out and were thus entitled to compensation. As in the instant case, there was no dispute or difficulty with that plant solely, but the dispute was with all of the employers, and the strike was obviously for the purpose of obtaining a new contract with all of them favorable to the entire group of employees. The majority of the California Supreme Court held, in accordance with the principle of the *Bunny's Waffle Shop* case above referred to, that the party to first use the weapon of its economic pressure against the other side was the one chargeable with the responsibility for the work stoppage. The court said at page 605 of 209 P. 2d:

"It seems clear that under such industry-wide, single contract negotiation, economic action by either side, whether strike or lockout, would be considered by each of the parties as action against the entire group struck or locked out."

Consideration of these two California cases emphasizes the fact that where a multi-unit employer group is bound together to bargain collectively with labor unions, if a work stoppage is brought about by action of the employers in putting economic pressure on the employees, the latter are eligible for unemployment compensation benefits; if a work stoppage occurs as a result of a strike by any of the employees for the benefit of all, aimed at all of the employers, then all of the employees are ineligible.

I think that principle is sound and should be squarely approved by us so that both labor and management will know that he who first resorts to the use of work stoppage as a means of putting on economic pressure to settle a dispute will be chargeable with the responsibility of having done so.

Thus, the critical fact to be determined is whether the conduct of labor or management is the primary and initiating cause of the work stoppage, or as phrased by Mr. Justice Schauer in the *McKinley* case:

"* * * it was proper to relate responsibility for the work stoppage to the party who created its actual and directly impelling cause."

That brings us down to the "brass tacks" of the situation in this case. There is no dispute about the fact that claimants were all members of the Six Basic Craft Unions and that the Building Trades Council was their collective bargaining representative; that they all belonged to the "grade, class, or group" of workers whose wages were being bargained for. We thus have the Building Trades Council, representing the entire group of workers of all of these employers, aligned on one side of the controversy, and on the other side were all 75 members of A. G. C. who were also bound together as a collective bargaining unit; the Unions and the Association had established a long practice of bargaining as a unit; the 1949 contract between them was still in force at the time of the strike; by its terms the employees as a group had agreed to bargain collectively with the A. G. C. representing all of the employers. The only dispute and the only negotiation between the parties was in regard to the wage scale for the entire group of workers and against the entire group of employers. There was no separate demand made, no dispute existed, and no separate negotiation was carried on or proposed with the Barker and Paul firms (the ones picketed). Even after the strike was called, negotiations were continued between the Building Trades Council and the A. G. C. as a group.

Under the circumstances here shown, it is indisputable that, although this strike and picketing was actually carried on against two firms only, it was authorized by the Union as an economic weapon to put pressure on all of the employers for the benefit of all of the employees with respect to negotiation of the master contract.

Mr. Roberts, Secretary of the Building Trades Council, testified:

"Q. Did any of the business agents * * * advise the workers —other than the Barker and Paul workers not to report to work after

June 1st? A. On the contrary, they were definitely instructed to keep the men working—outside of those two jobs—until the strategy committees recommended further action."

And he further answered:

"* * * I think it was their [the Union's] intention to go on to and picket other jobs if they thought the occasion would warrant it *to get the contractors lined up."* (Empasis added.)

In accordance with the foregoing candid statement is the argument of the A. F. of L. to this court that although the action was by the unions collectively and against all of the employers, the claimants are not disqualified. Its position, as stated in its brief in their behalf, is that they are entitled to compensation even if the unions:

"* * * intended to assess the members of their respective unions, remaining at work and thus contribute supplementary benefits to the unemployment compensation benefit to the strikers; * * * or may have intended to pick off one employer at a time; or may have intended to divide the employers; or may have intended to soften the demands on their treasuries; * * *."

Claimants stress the contention that they are disqualified only if the

"* * * unemployment is due to a stoppage of work which exists because of a strike involving his grade, class, or group of workers *at the factory or establishment* at which he is or was last employed." (Italics added.)

The words "at the factory or establishment" were used in the statute before, and undoubtedly without any contemplation of industry wide bargaining, for the purpose of tying the disqualification down to the *group of workers* actually involved in the strike.

This court has said in *Members of Iron Workers Union* v. *Ind. Comm.*, 104 Utah 242, 139 P. 2d 208, 213:

"It is not only those who foment the strike or bring it about who are ineligible, but the group to which such persons belong—however inclusive—the group for whose benefit the strike is called."

Once the entire group of employers, A. G. C., became bound in a contract for collective bargaining with the entire group of employees (Six Basic Crafts), then these two groups, insofar as their relationship to each other concerning bargaining for wages, hours and work conditions under the master contract was concerned, became as single units, one group to deal collectively with the other group. That is the negotiation which was being carried on and with respect to which the dispute arose which gave rise to the work stoppage we are concerned with. It is clear beyond doubt that the Union was the collective bargaining representative of these claimants; that it authorized and ordered this strike against the two employers as an economic weapon against all of the employers to force a wage increase for all of the workmen in the Six Basic Crafts; that the claimants were members of the "grade, class or group" for whom the strike was called; that the strike was attended by success and that the claimants benefited therefrom along with the striking employees and all other workmen employed by the A. G. C.

Inasmuch as claimants were members of the "grade, class or group" for whose benefits the strike was called: they were involved in the strike, and being so, they were involved wherever they were situated, including in their own plants or establishments; and are, therefore, ineligible for benefits.

I concur in reversing the order of the Commission.

WADE, Justice (dissenting).

Section 42-2a-5, U. C. A. 1943, which should be controlling in this case, provides:

"An individual shall be ineligible for benefits * * *:
"(d) For any week in which * * * his unemployment is due to a stoppage of work which exists because of a strike involving his grade, class, or group of workers at the factory or establishment at which he is or was last employed.

"(1) If * * * a strike has been fomented by a worker of any employer, none of the workers of the grade, class, or group of workers of the individual who is * * * a party to such plan, or agreement to foment a strike, shall be eligible for benefits; * * *."

The language of (d) is clear and unambiguous that in order for a workman to be ineligible for benefits thereunder his unemployment must be due to a work stoppage caused by a strike at the factory or establishment where he was employed. This language clearly does not make two grounds for ineligibility but states only one ground which has several qualifications and unless all the qualifications stated exist the worker is not disqualified for benefits, and one of those conditions stated is that there must be a strike causing the unemployment at the factory or establishment where such worker was employed. I cannot agree with the contention which the prevailing opinion seems to make: That this provision intended to require only that his grade, class or group of workers must be at the factory or establishment where he was previously employed and did not intend to require that the strike causing the unemployment be at such factory. Such construction seems to be contrary to the clear and obvious meaning of the language used. Also, if such were the intent, then the words "at the factory or establishment where he is or was last employed" add nothing whatever to the meaning of this provision, for if his unemployment is caused by a strike such strike must involve his grade, class or group of workers at the plant where he was employed because if it did not involve such group, it could not cause his unemployment. There is nothing in (1) of the statute which justified the majority construction.

I agree with the prevailing opinion that the 1935 and 1936 amendments were intended to refine and clarify the disqualification provision. The amendment makes it crystal clear that the disqualification provision requires a strike at the plant where the worker was previously employed. Prior to the amendment a worker who "left or lost his em-

ployment due to a trade dispute involving the employer by whom he was employed," was not entitled to benefits "so long as such trade dispute continues". A "trade dispute" is a much broader term than a "strike at the factory or establishment" where the worker was last employed. A strike contemplates that the employees by concerted action stop work but a trade dispute requires only that there is a dispute or disagreement between the employer and employees. If, as the prevailing opinion contends, the amendments were intended to clarify and refine the meaning, the legislative intention must have been to make it clear that the disqualification provision should apply only where the workers' unemployment is due to a strike at the factory or establishment where he was last employed. Otherwise the amendment had the effect of creating confusion and uncertainty rather than refinement and clarity.

The cases from California relied on in the prevailing opinion are distinguishable from our statute in that the wording in their statute is similar to ours before the amendments, where the terms construed were a trade dispute and not a strike at the factory or establishment where the worker was last employed, but even under such a statute three judges out of seven dissented, *McKinley* v. *California Employment Stabilization Commission,* 34 Cal. 2d 238, 209 P. 2d 602. Also, the case of *Members of Iron Workers' Union of Provo* v. *Ind. Comm.,* 104 Utah 242, 139 P. 2d 208, relied on in the prevailing opinion has no bearing whatever on our problem here. There, all of the employees involved worked at the same plant and a strike was called by the employees of that plant. We merely held that members of a rival union belonged to the same grade, class or group where they did the same kind of work.

HENRIOD, J., not participating.