HARRY A. DEPAOLI, EXECUTIVE DIRECTOR OF NEVADA EMPLOYMENT SECURITY DEPARTMENT, APPELLANT, v. MELVIN H. ERNST, ET AL., RESPONDENTS.

No. 3966

April 1, 1957                    309 P.2d 363

*Vargas, Dillon & Bartlett,* and *Alex A. Garroway,* of Reno, for Appellant.

*T. L. Withers,* of Reno, for Respondents.

## O P I N I O N

By the Court, EATHER, J.:

This appeal is taken by the executive director of the State Employment Security Division from a judicial determination that respondents are entitled to unemployment compensation. The period of unemployment, approximately three weeks, occurred in 1955 during the course of a labor dispute between respondents and their employers. The question involved in this appeal is whether respondents were by statute disqualified from receiving compensation by virtue of the fact that their unemployment was due to the labor dispute in which they were engaged. The executive director contends that they were. Respondents, with whom the district court agreed, contend that they were not.

The proceedings thus far had are in accordance with the provisions of the Unemployment Compensation Act. Respondents' claims for benefits received an adverse

determination by the executive director. The determination was appealed and hearings were had before an appeal referee, at which extensive testimony was taken. The decision of the appeal referee affirmed the determination of the executive director and an appeal was taken to the board of review which affirmed the decision denying benefits. Court review was then sought by the commencement of this action in the lower court. With respect to the court review, sec. 612.530, NRS, reads in part: "In any judicial proceedings under this section, the finding of the board of review as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law."

Upon the issues presented by this appeal the pertinent section of the Unemployment Compensation Act is sec. 612.395, NRS. It provides that one is "disqualified for benefits for any week with respect to which the executive director finds that his total or partial unemployment is due to a labor dispute in active progress at the factory, establishment, or other premises at which he is or was last employed."

Respondents are all members of Local Number 533 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. They are what is known as long line drivers, operating trucking units on interstate routes which run from California through Nevada to the east. Their conditions of employment are fixed by contract with their employers, known as the "Long line and turn around collective bargaining agreement." Terms of the agreement, in major respects at least, are the same for all long line employers whose employees are members of Local 533.

Prior to May 1, 1955 the major terms of the Nevada contracts having to do with wages, working conditions and employees' benefits were negotiated periodically in Salt Lake City between the union and all interested employers in the intermountain area, being members of the Intermountain Truck Operators Association. The terms thus agreed upon were incorporated into the

separate agreement signed by Local 533 with each Nevada employer.

The Nevada long line employers were for the most part, as interstate carriers, also members of the California Trucking Association. Their contracts with California locals were, prior to May 1, 1955, negotiated periodically in California in common with other California long line employers. Due to its close connection with California locals, through interstate routes in which all were commonly interested, Local 533 was a party to the California line agreement.

The annual expiration date of long line collective bargaining contracts in the western states is May 1. Prior to May 1, 1955, pursuant to the terms of their contracts, Local 533 gave notice to the Nevada employers of their desire to negotiate new terms relative to wages, pension provisions, working conditions and other employee benefits. Similar notice was given by other locals throughout the western states. In April 1955 at least two meetings between representatives of the Local 533 and Nevada employers were held in Reno. No agreement was reached locally.

Looking toward a blanket agreement to apply throughout the 11 western states, negotiations were then had in California. The Nevada employers were represented there. Interested locals of the union were represented by a negotiating committee on which A. O. May, secretary-treasurer of Local 533, served as a member.

Local 533 voted to support the negotiating committee's action to obtain a uniform contract. The business agent of the local, Norris Bertrand, testified: "There was a meeting held in which the line drivers voted a full vote of confidence to Brother May * * * and the negotiating committee for the purpose of negotiating a satisfactory agreement, and with authority, if it was necessary, to call a strike."

On May 19, 1955, no agreement having been reached, certain California locals struck three Nevada employers at their California terminals. This strike resulted in all respondents being laid off work. The record is not too clear and findings of the board of review and of the

lower court are not in harmony as to the direct cause of the layoff. Certain employers testified and the board of review found that the layoff was the result of employer lockout, the employers regarding the strike of California locals as a strike against all employers engaged in the joint negotiation effort. Both May and Bertrand testified that the union regarded the layoff as a lockout.

On the other hand certain employers testified and the lower court found that the layoff was due solely to the fact that the California strike prevented the flow of truck traffic through Nevada since substantially all such traffic originates in California; that the layoff was due simply to the fact that there was no work for the Nevada drivers.

From the record it would appear that the layoff was due in part to lockout and in part to lack of work. In either event the layoff clearly resulted from the strike in California.

On June 10, 1955 an agreement was reached in California between the employer representatives and the union bargaining committee. The California strike was terminated. On June 12, 1955, following a meeting in Reno between representatives of the employers and Local 533, long line truck traffic commenced once again to flow through Nevada and respondents' unemployment ceased. Local contracts had not been executed but it was understood that the agreements reached in California would be incorporated into all local contracts, with the mechanics of carrying out such agreements remaining to be worked out. As Mr. May testified, the local and the Nevada employers would "negotiate on the basis of the uniform agreement which had been arrived at throughout the industry." Strike benefits were paid by the international union to respondents for the period of their unemployment.

Whether the layoff in Nevada was due to lockout or to lack of work would appear to be of no consequence. The question is whether the lockout or lack of work, which was the cause of unemployment, was due to the labor dispute then in existence between Local 533 and

the Nevada employers. Respondents emphasize that Local 533 was not on strike; that the record demonstrates that all respondents were available for work and willing to work, notwithstanding the fact that their contracts were still being negotiated and that no agreement had been reached. They insist that they had no control over the California locals that were responsible for the strike. They contend that the record thus conclusively demonstrates that their unemployment was not due to the fact that their particular local dispute with the Nevada employers had not been settled.

But the record demonstrates that their dispute was no longer a local dispute. It had become an area-wide dispute in common with the locals of 11 western states who were represented in the joint negotiations being carried on in California. The board of review found as fact: "Local 533 joined with other locals of the international brotherhood * * * to carry on joint negotiations with the employers who were members of one or more trucking associations which represented the employers during negotiations."

We must accept, then, that the California negotiations were for the industry as a whole in the 11 western states and were carried on to the end that certain basic differences should be uniformly resolved throughout the entire area and thus avoid the necessity for regional or local meetings for settlement of its basic problems.

Action by certain interested locals during the course of such industry-wide negotiations has been recognized in California and Utah to be tantamount to concerted action by and on behalf of all participating locals, McKinley v. California Employment Stabilization Commission, 34 Cal.2d 239, 209 P.2d 602; Olof Nelson Construction Company v. Industrial Commission, 121 Utah 525, 243 P.2d 951. As stated in the McKinley case [34 Cal.2d 239, 209 P.2d 605], "The selection of a certain plant or plants for a shutdown by strike at a particular time was a mere matter of strategy in the conduct of the trade dispute which equally involved all of the bakeries and their employees. This, in effect, applied the union's economic sanctions against each employer and brought about the

unemployment of all its members. Had the association acted first by closing down one of the members' plants and the union followed with a strike against all of the remaining plants, it would be equally clear that the volitional act causing unemployment was the initial shutdown.

"Either the union or an individual employer, at any time, could have broken off joint negotiations and bargained with its employees on an individual basis. But that course was not taken. At no time did the union purport to be directing any action solely against the Butter Cream plant; instead, the union continued throughout to deal directly with the association for the purpose of obtaining a new master contract. To say, therefore, that the act of striking the one plant did not shut down work in other plants of the association which were subject to the labor negotiations for the purpose of obtaining a master contract is wholly unrealistic."

As stated in the Olof Nelson Construction Company case [121 Utah 525, 243 P.2d 956], "There is no doubt that the union's objective in striking the two jobs was to apply economic pressure to assist the bargaining representatives of the Six Basic Crafts in obtaining an industry-wide wage raise. The unions were successful in this strategy.  * * * There is no dispute that the economic sanction of the A. F. of L. in this case was directed against the entire employer association. The strike was called for and on behalf of every employee covered by the agreement. It therefore directly involved all these claimants, at each particular place of employment at which they were last employed. The strike was fomented by claimants through their duly authorized union representatives. They are members of the group which gained a raise in wages because of the strike and are parties to the scheme or plan to foment it. Therefore they are not entitled to unemployment benefits.  *   *   *"

The courts in those two cases were concerned as to whether when a general lockout followed a strike against other employers, all of whom were negotiating jointly,

the unemployment is to be attributed to the strike or to the lockout. Under the statutes in those states such a distinction is material. Such is not the case in Nevada. Section 5 of our statute, hereinbefore quoted, is similar to the Illinois statute. In Buchholz v. Cummins, 6 Ill.2d 382, 128 N.E.2d 900, 902, this provision was discussed. The court stated, "A few states such as California incorporate a test of voluntariness disqualifying only those who 'leave their work' because of a labor dispute. * * * However, sec. 7(d) [of the Illinois Act, S.H.A. ch. 48, sec. 223 (d)] specifically disqualifies any individual for benefits for any week in which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the establishment at which he is or was last employed. By this provision the Illinois legislature adopted the policy that the State shall not, by payment of unemployment compensation, assist one party to a labor dispute, regardless of fault; and that the state in cases of industrial strike ought not to take sides and place blame. This provision was designed to maintain the neutrality of the State in labor disputes. This labor dispute clause is a departure from the general idea of relief from involuntary unemployment. The question of voluntariness in such a case is not the test. * * * If a labor dispute results in the closing of a plant or factory, the statute does not place the blame, but considers the resulting unemployment as caused by a labor dispute. * * *"

We hold then, that the dispute in aid of which the California strike was called was the dispute of Local 533; that the lockout or layoff of respondents was a direct consequence of that dispute; that the unemployment of respondents was due to the labor dispute in active progress at their respective places of employment. They are, then, disqualified from benefits under sec. 612.395, NRS, of the Unemployment Compensation Act.

Judgment of the lower court is reversed. The decision of the board of review is affirmed.

BADT, C. J., and MERRILL, J., concur.