348 P.2d 558

**TEAMSTERS, CHAUFFEURS AND HELPERS OF AMERICA, LOCAL UNIONS NO. 222 AND NO. 976, for and on behalf of their membership, Plaintiffs,**

v.

**BOARD OF REVIEW, DEPARTMENT OF EMPLOYMENT SECURITY of the Industrial Commission of Utah, et al., Defendants.**

No. 9063.

Supreme Court of Utah.

Jan. 20, 1960.

A. Park Smoot, Salt Lake City, for plaintiffs.

Walter L. Budge, Atty. Gen., Fred F. Dremann, Salt Lake City, for defendants.

Ira A. Huggins, Ogden, amicus curiae.

CROCKETT, Chief Justice.

Review of the action of the Industrial Commission in denying unemployment compensation to plaintiffs on the ground that their unemployment was caused by a strike involving their group of workers. Plaintiffs dispute this finding and contend that the evidence will not support it.

Plaintiffs are employees of interstate trucking firms having terminal facilities in the Salt Lake City and Ogden areas. They are of two groups: (1) truckdrivers, referred to as Line Drivers, and (2) all other employees including local pickup and delivery drivers, warehousemen, maintenance and service personnel and office workers, referred to as Terminal Employees. They are all members of either Local Union 222 of Salt Lake City or 976 of Ogden of the plaintiff union, all of the Line Drivers being members of Local 222.

Plaintiffs became unemployed in this way: the Terminal Employees of Teamsters Joint Council 38 in the Sacramento, California, area went on strike because of a dispute over wages. Employers in the western states, acting collectively in a unit known as Western Empire Operators Association, elected to consider the Sacramento strike as a strike against all employers, and locked out all of their employees, which included these plaintiffs working for interstate trucking concerns in Utah.

The denial of unemployment compensation was on the basis of Section 35–4–5 U.C.A.1953, which provides:

"An individual shall be ineligible for benefits * * *

"(d) For any week in which * * * his unemployment is due to a stoppage of work which exists because of a strike involving his grade, class, or group of workers at the factory or establishment at which he is or was last employed."

A further factual background as to this work stoppage is as follows: Locals 222 and 976 are members of Joint Council 67, which comprises the Teamsters' locals in Utah and Idaho. The trucking interests

in the same area have also joined for purposes of negotiating with the unions in an organization known as Intermountain Operators League. Traditionally negotiations for the employers and the unions have been carried on for more than 25 years between it and Joint Council 67.

In 1955 the Western Conference of Teamsters, a regional organization in the 11 western states, appointed a committee to explore the possibility of negotiating contracts for Line Drivers on an 11-state basis. That committee was unable to obtain authority from the locals to act in their behalf, and, lacking this, no further attempts were made to negotiate with employers. In 1958 this same Western Conference renewed efforts to obtain authority from the locals for negotiating on a multistate basis. To this end two committees were formed by the Conference. One, known as the Woxberg Committee, was concerned with negotiations for the Line Drivers, and another, known as the Filipoff Committee, was concerned with negotiations on behalf of the Terminal Employees. It should be remembered that neither of these committees had any power to act for the local unions without specific authorization from them.

Beginning in February, 1958, a series of meetings was held between the Woxberg (Line Drivers) Committee and a committee representing the Western Empire Operators Association (the employer group for the 11 western states). The purpose was to explore the possibilities of obtaining work contracts on the multistate basis, and if this could be done, to negotiate such contracts. The Woxberg (Line Drivers) Committee had by this time obtained permission to represent all locals in the area involved: to negotiate, but not to conclude any contract, nor to bind the locals. Ratification by a majority of the Line Drivers, not by the locals acting as a unit, was necessary before any action taken by the committee would be binding.

During the same time, the Filipoff Committee was making attempts to obtain authority from the locals to negotiate on behalf of the Terminal Employees on a multistate basis. The committee was partially successful, but it failed to obtain such authority from a number of locals, including those in Utah and Idaho. Notwithstanding this, the committee proceeded with efforts to obtain the cooperation of the employers in conducting negotiations. The record is clear, however, that the employer groups refused to enter into any negotiations with the Filipoff Committee. The employers in Utah and Idaho, acting through their secretary-counsel, in response to letters from Mr. Filipoff, stated on three separate occasions that they would not negotiate contracts for Terminal Employees on any other basis than that which had been done theretofore: that is, with Joint Council 67. Being unsuccessful in its at-

tempts to bring about bargaining on an 11-state basis, the Filipoff Committee then attempted to negotiate with employers groups separately at the joint council level. Though there were preliminary negotiations carried on with some groups, none were held with Joint Council 67 (Utah-Idaho). Plaintiffs' evidence is that sometime in May, 1958, having been unsuccessful in its purpose, the Filipoff Committee formally relinquished whatever authority it had received from the various locals, and for all practical purposes ceased to exist.

Negotiations between the employers group and the Woxberg (Line Drivers) Committee continued. Meetings were held in San Francisco, Phoenix, and again in San Francisco for purposes of reaching agreement on a multistate contract for the Line Drivers. The contracts which had been negotiated in 1955 were to expire May 1, 1958. But by agreement among the parties concerned, the contracts were extended temporarily pending outcome of the negotiations. By mid-May a proposed master agreement had been worked out as to general conditions of employment but problems as to wage schedules, road expenses, and certain other issues remained undecided and the negotiations reached an impasse on or about May 26, 1958.

In an attempt to resolve those difficulties, a small group of representatives of both sides met at San Francisco on May 27 and out of that meeting came a settlement proposal agreeable to those negotiators. It was later submitted to the Line Drivers of the various local unions, a majority of whom approved it, thus obliging all of the Line Drivers to accept it. As to whether it applied to Terminal Employees the parties are in dispute: the employers urge that it covered both classes of employees, while the unions insist that it could only apply to the Line Drivers, as the union negotiators had no authority to act for the Terminal Employees. Whatever view is taken of that controversy, ratification by the Terminal Employees would have been necessary to make the agreement effective as to them. The evidence is that this was done only in some of the areas, notably Los Angeles, where it was accepted but no contract was actually entered into. However, it was not done in others. Particularly, it was not even submitted in the Joint Council 67 (Utah-Idaho) area.

Further supporting the employees' contention is the fact that thereafter negotiations in the traditional way between representatives of Joint Council 67 (Utah-Idaho) and the corresponding employer group (Intermountain Operators League) were carried on in Salt Lake City on June 6 and June 12. The employers made a proposal somewhat different from the one made at San Francisco May 27. It was submitted to the locals and was accepted in part but was rejected as to hourly wages. This was made known to the employers but no further action was taken at that time.

68

The above was the status of the contract negotiations in the trucking industry at the time the Terminal Employees of Joint Council 38 of the Sacramento area went on strike. The May 27 proposal had been submitted to those employees in a state-supervised election on June 12. With the exception of one group, the clerical workers, they voted to reject the agreement, and to strike unless their wage scale was raised to equal that in the San Francisco Bay area. This wage differential had been a sore spot with these employees and efforts had been made to equalize the wages for some time past. The California Truckers Association refused to make any other offer than that already submitted. It was in the face of this strike threat by Joint Council 38 that representatives of the 11-state employers (Western Empire Operators Association) notified all Joint Councils in the western states that a strike against one employer of the group would be considered a strike against all. Pursuant to this declaration, when Joint Council 38 went on strike on August 11, 1958, the other employers proceeded to lock out their employees, both Line Drivers and Terminal personnel, which included these plaintiffs employed in Utah.

It was upon the basis of the above facts that the Appeals Referee found that the plaintiffs were members of a group involved in a strike, which determination was

sustained by the Board of Review and adopted by the Industrial Commission.

In making such determination the Referee cited Olof Nelson Construction Co. v. Industrial Commission [1] and Teamsters, etc. v. Orange Transportation Co.,[2] as requiring such conclusion. It appears quite clearly that the determination was made under a misunderstanding as to the law set forth in those decisions. In his findings the Referee stated:

"* * * It must first be pointed out that under the interpretation laid down by the Supreme Court, it must be considered that *there is no basis for separation of the sub-units from the whole group. * * *

"Both the line drivers and the local drayage workers were members of the same local unions in Utah and Idaho and in many instances during negotiations were represented by the same union officers.

*       *       *       *       *       *

"In both [the cases referred to] * * * *the court did not accept the concept of separability of the sub-units composing the employers' group.* And by the same reasoning it is considered that *the court did not recognize any separability of the units of the union group.* Any separate bargaining by sub-units in this case was done merely

1.  121 Utah 525, 243 P.2d 951.

2.  5 Utah 2d 45, 296 P.2d 291, 294.

as a practical convenience and did not relieve any of the sub-units of either of the large composite groups from the consequences of the volitional test as applied to the sub-units of either group. Therefore inasmuch as the applicants became unemployed as a result of the counteraction of the employers after members of the union group had made the first pressure move by calling a local strike, it must be considered that their unemployment was due to a stoppage of work because of a strike the same as in the teamsters' case decided by the court as aforementioned." (Emphasis ours.)

The determination made seems to proceed upon the assumption, as indicated in the emphasized language, that those cases announce some sort of mandate that wherever there are a group of unions on the one side and a group of employers on the other, each group must be held responsible for whatever any member does. We do not regard those cases as standing for that proposition. On the contrary, there is no basis for holding the group responsible for the acts of one unless it is affirmatively established that the group is engaged in a concerted action and that the action of one is in fact done for the group as part of the plan.

In the Olof Nelson[3] case there was a sound foundation in the evidence for the finding that the unions were in fact engaged in concerted action. There the Building Trades Council, representing the unions of the six basic building crafts, were aligned on one side of the controversy and the Associated General Contractors on the other. It was unquestioned that the two organizations were the bargaining units representing all of the unions and all of the contractors. There had been a long history of bargaining together; they had agreed upon the existing contract which had been ratified by their organizations; it provided that after it expired they should bargain again for a new contract to supplant it. Even after the strike was called, negotiations continued between the two groups. Further, and of great importance: the evidence showed that a responsible union leader had stated that their intention was to proceed to picket other employers "if they thought the occasion would warrant it to get the contractors lined up." It was upon this basis that the finding was made that the strike against two of the contractors was part of a plan to force acceptance of the union's demand by all 75 of the contractors involved.

The same principle was involved in the Teamsters, etc. v. Orange Transportation Co. case.[4] There the two opposing groups admittedly had been organized for the purpose and had the authority to bargain for their principals, the unions on the one side

3. Footnote 1, supra.

4. Footnote 2, supra.

and the employers on the other; they were engaged in so bargaining together; and there was a history of their having done so in the past. On such facts it was concluded:

"Our review of the record * * * indicates that there was evidence from which the Appeals Referee could find that the action of the Union was aimed at the Intermountain Operators' League as a group with which it was negotiating, that Orange and Inland were members of that group, and that the strike was initiated for the purpose of forcing capitulation of all members of the Employers' Group."

The evidence in the instant case will support no such conclusion. It is significantly different from that in the Olof Nelson and Orange Transportation cases: There was no past history of collective bargaining for the entire 11 western states as a group. Efforts to bargain for Terminal Employees on that basis had proved abortive. The Intermountain Operators League (Utah-Idaho) of employers had rejected the attempt of the Filipoff (Terminal Employees) Committee to bargain on the 11-state basis, and had refused to attend meetings for that purpose. The May 27 agreement had never been submitted to the Terminal Employees of Joint Council 67. After that date negotiations had continued on the traditional level between Joint Council 67 and the Intermountain Operators League (Utah-Idaho), and the League had refused to bargain on any other level. A further important fact is that the controversy upon which the Joint Council 38 (Sacramento) strike had its focus was to get parity with the wage scale in the Oakland Bay area. This was a local dispute and from anything that appears, could have been settled without in any way affecting the management-labor problems in Joint Council 67 (Utah-Idaho) area. Both were autonomous union groups carrying on their own independent negotiations and each without control over or responsibility for the other.

It is one thing to look behind the facade of an employee-employer labor controversy to see the true situation and recognize a strike by some members of a group as part of a plan to "bring the employers into line"; and it is quite another thing to extend that idea so far as to permit a group of employers to seize upon the fact that there is a common interest and relationship between unions which have engaged in some efforts at joint negotiation as a basis to serve notice on them that the employers "will consider a strike against one as a strike against all" and threaten them all with a lockout and work stoppage for which all will be held responsible. Such a declaration does not change the realities of the situation.

It would be just as unfair to permit the employers, by a unilateral declaration, to force all of the unions into such a combine in order to exert pressure on indi-

vidual unions by threatening lockout of all if any one should strike, as it would be to permit labor to band together and use separate strikes to put pressure on all of the employers, and escape responsibility for collective action. In either situation the basic facts should be recognized and responsibility placed where it belongs. In a controversy of this character, the critical issue is whether the conduct of labor or of management is the real and fundamental cause of the work stoppage. As phrased by Mr. Justice Schauer in the case of McKinley v. California Employment Stabilization Commission:[5] " * * * it was proper to relate responsibility for the work stoppage to the party who created its actual and directly impelling cause."

That such a rule is much easier to state than to apply is not to be gainsaid. There are indeed two sides to every dispute, and it is rare if ever that the right is all to be found on one side and the wrong on the other. However, in considering the applicability of the rule to the instant case it should be borne in mind that the plaintiff employees were willing to continue working on the basis of existing conditions but were locked out by their employers. This established prima facie that they were involuntarily unemployed, which entitled them to unemployment compensation unless some reason appeared to disqualify them. Such a result would not eventuate unless the evidence demonstrated that these Utah employees were tied together with Joint Council 38 so that the strike of the Sacramento union was part of a plan of concerted action against all of the employers. Only under those circumstances could the latter have fairly and realistically treated that strike as a strike against all of them and thus have justified the lockout and imputed the responsibility for the Utah work stoppage to the strike of all the employees as a group. As we view the record here, it is devoid of any substantial basis upon which such a conclusion could rest.

Cognizant of the rule that we do not disturb the findings and order of the Industrial Commission if there is substantial basis in the evidence to support its action,[6] we nevertheless conclude that the order denying plaintiffs unemployment compensation should be, and it is,

Reversed. No costs awarded.

WADE, McDONOUGH, and CALLISTER, JJ., concur.

HENRIOD, J., concurs in result.

5. Concurring opinion, McKinley v. California Employment Stablilization Commission, 34 Cal.2d 239, 209 P.2d 602, 608.

6. Peterson v. Industrial Commission, 102 Utah 175, 129 P.2d 563.