**Markle E. DANIEL, Plaintiff,**

v.

**INDUSTRIAL COMMISSION OF UTAH, Department of Employment Security, Defendant.**

and

**CLAIMANTS WHO ARE MEMBERS OF TEAMSTERS, CHAUFFEURS AND HELPERS OF AMERICA, LOCALS 222 AND 976, Plaintiff,**

v.

**BOARD OF REVIEW, The Industrial Commission of Utah, Department of Employment Security and the Intermountain Operators League, Defendants.**

Nos. 16679, 16690.

Supreme Court of Utah.

Sept. 4, 1980.

Markle E. Daniel, pro se.

Stephen W. Cook, Salt Lake City, for Teamsters, Chauffeurs and Helpers of America, Locals 222 and 976.

Robert B. Hansen, Atty. Gen., Salt Lake City, for Industrial Commission.

K. Allan Zabel, Asst. Atty. Gen., Salt Lake City, for Employment Sec.

Nathan J. Fullmer, Salt Lake City, for Intermountain Operators League.

STEWART, Justice:

Plaintiffs seek judicial review of the decision of the Board of Review of the Industrial Commission of Utah denying unemployment compensation benefits during a selective labor strike, followed by an industry–wide lockout from April 1, 1979, through April 14, 1979. The Board adopted the findings of fact and conclusions of law and affirmed the decision of the appeal referee who found that the unemployment was "due to a stoppage of work which existed because of a strike involving [plaintiffs'] grade, class, or group of workers." The Board accordingly denied unemployment compensation benefits.

On this appeal, brought pursuant to § 35–4–10(i) Utah Code Ann. (1953), as amended, plaintiffs seek a reversal of the denial of unemployment compensation benefits. Claiming conduct of management, rather than labor, to be the fundamental cause of both the strike and lockout, plaintiffs contend that all idled employees, both the striking and the locked–out employees, are entitled to compensation. Plaintiffs also claim that even if management was not responsible for the initial strike, benefits should have been granted those employees who did not strike but were locked out by their employers. Finally, plaintiffs claim that the criteria used for granting or denying unemployment compensation benefits violated their equal protection and due process rights.

The plaintiffs consist of approximately 1,300 members of the Teamsters, Chauffeurs and Helpers of America, Locals 222 and 976. The Intermountain Operators League, one of the defendants, is a nonprofit voluntary association of companies engaged in the business of transporting freight by motor vehicle in Utah and elsewhere. Its numbers include Consolidated Freightways, Inc. (CFI); Garrett Freightlines, Inc. (Garrett); Illinois–California Express, Inc. (ICX); I.M.L. Freight, Inc. (IML); and Pacific Intermountain Express Company (PIE). The claimants of the plaintiff union are employed by the above–named companies.

From 1976 to 1979 the Teamsters and the Intermountain Operators League were parties in their respective representative capacities to a collective bargaining agreement called the National Master Freight Agreement. The purpose of the agreement was to regulate the terms and conditions of all phases of employment between the employers signatory to the agreement and their respective employees. The agreement terminated midnight of March 31, 1979.

Prior to the expiration of the 1976–1979 agreement, collective bargaining proceedings were instituted to revise or change certain terms and conditions of the Nation-

al Master Freight Agreement to become effective April 1, 1979. Teamsters Locals 222 and 976, as well as other teamsters locals in the United States, granted the National Freight Industry Negotiating Committee of the International Brotherhood of Teamsters (IBT) in Washington, D. C., authority to act as their collective bargaining agent. In like vein, the Intermountain Operators League, consisting of the employers herein involved, as well as approximately 11,000 other trucking firms in the United States, authorized Trucking Management, Inc. (TMI) to act for them as their collective bargaining agent. The Teamsters Locals and the employers involved in this suit submitted authorizations to the respective committees to represent them in the ensuing negotiations.

Upon failure to reach an agreement between the negotiating committees, the union called a "selective strike" shortly after midnight of March 31, 1979. IBT selected 73 out of 11,000 trucking firms to strike. The employers in Utah which were struck were CF, Garrett, ICX, and PIE. The selective strike was intended to proceed in a manner not to interrupt the operations of an employer not struck.

In response to the strike, an industry-wide national lockout of all employees was called by TMI at 1:00 p. m. on April 1, 1979, from Washington, D. C. In Utah IML, a company employing approximately 600 teamsters, was not struck–nationally or in Utah, but it locked out its 600 employees in accordance with TMI's order. CFI also complied with the lockout order.

A settlement was reached on April 11, 1979, and all strike activities by the Teamsters ceased. Work did not resume until April 14, 1979, due to strike activity in progress by the International Association of Machinists, Automotive Lodge 1020. The objective and result of the strike, initiated by IBT, was to gain wage and benefit improvements for all employees covered by the National Master Freight Agreement.

The first issue raised on appeal is plaintiffs' assertion that all idled employees are entitled to unemployment compensation because the real and fundamental cause of the work stoppage resulting from both the employees' strike and the employers' lockout was the conduct of management and government, rather than the acts of labor. The issue to be resolved is whether the employees or the employers were the controlling influence in bringing about the work stoppage.

Section 35–4–5(d) Utah Code Ann. (1953), as amended, provides:

An individual shall be ineligible for benefits . . .

(d) for any week in which it is found by the commission that his unemployment is due to a stoppage of work which exists because of a strike involving his grade, class, or a group of workers at the factory or establishment at which he is or was last employed.

1. If the commission, upon investigation, shall find that a strike has been fomented by a worker of any employer, none of the workers of the grade, class or group of workers of the individual who was found to be a party to such plan, or agreement to foment a strike, shall be eligible for benefits . . . .

Plaintiffs claim that the facts show the responsibility for the work stoppage rests on management and government, that it was their conduct, rather than plaintiffs', which created the actual cause of the ensuing strike and lockout. Plaintiffs contend that the actions of IBT evidence labor's intent to avoid any cessation of work. They further assert that one purpose of commencing negotiations nearly three months prior to the expiration of the old contract was to avoid the necessity of a strike or a lockout. Further evidence of an intent to avoid unemployment is suggested by IBT's calling of a selective strike, rather than a national industry–wide strike, and the offering of "interim agreements" to all employers represented by TMI who desired to continue operation. Although no employer in this case signed the interim agreement, hundreds of trucking firms apparently did sign and continued operation.

Plaintiffs assert that they are without fault and specifically attribute the cause of the selective strike to the bad–faith bargaining exhibited by TMI in submitting highly inadequate economic counterproposals and thereby attempting to precipitate a nationwide strike and cause the federal government to secure a Taft–Hartley injunction for eighty days. Plaintiffs argue the retaliatory decision to engage in a nationwide lockout was also an attempt to cause a nationwide stoppage of truck transportation, creating a crisis situation which would require a Taft–Hartley injunction. Plaintiffs find additional support for their argument in TMI's instruction to all employers to shut down their operations and lock out its employees. The result, rather than being a selective lockout, is claimed to have caused an unwarranted escalation of work cessation.

Plaintiffs also state that TMI, in addition to instituting an industry–wide lockout, threatened legal action if IBT entered into interim agreements with employers. Finally, in light of the reports on corporate profits and a 13.4% annual inflation rate, plaintiffs justified their unwillingness to accept, and faulted management and government for admonishing labor to abide by, President Carter's voluntary wage and price guidelines of 7%.

Defendants have a different interpretation of the relevant events. They claim that a selective strike in lieu of a national strike was to prevent the President from halting the strike by a Taft–Hartley injunction. In defense of their failure to accept the "interim agreement," Intermountain Operators League claims that it was not offered to any of the employers in Utah.

■ If the interim agreement had resembled the conditions of the prior agreement under which the groups were operating, the Intermountain Operators League's supposed failure to accept plaintiffs' willingness to work would be highly pertinent in attributing dominant responsibility for the cessation of work. The interim agreement, however, apparently paralleled the union's last economic offer prior to the strike. Defend-

ants cannot be faulted for failing to accept plaintiffs' willingness to work under those conditions. Had the interim proposal been accepted, it would, no doubt, have been used as leverage in the labor negotiations. Such a tactic carries little weight in our view in determining who was predominantly responsible for the work stoppage.

■ As to the bad–faith argument presented by plaintiffs, defendant Intermountain Operators League correctly points out that its counteroffer, the maximum permitted under the government's revised pay standards, does not constitute bad faith merely because it was found unsatisfactory by the Teamster negotiating committee. Nor does the employer group's failure to agree to the demands of the Teamsters in order to avoid a strike place responsibility of the stoppage on TMI.

■ As pointed out by the Board of Review, the facts presented in an attempt to establish bad faith fail to show a refusal or failure of the employer representatives to bargain with the union. The Board stated: "Lack of good faith cannot be shown merely by a refusal to grant all requests and meet all demands."

The facts in this case clearly do not require a finding of bad faith, and the Board made no such finding. We are thus required to affirm the Board's conclusion that the employers acted in good faith and that plaintiffs are responsible for the work stoppage.

■ Plaintiffs' second ground for appeal centers around the specific denial of unemployment benefits to those employees locked out by their employers. CFI and IML were the two Utah companies which locked out their employees. The lockout by CFI occurred after the employees were already on strike, thus not affecting their status as strikers nor their ineligibility according to the express statutory language of § 35–4–5(d).

■ The position of the IML employees requires separate consideration, because IML was not struck by the union. Its lock-

out of its employees resulted from the defensive shutdown instituted by IML subsequent to the commencement of the selective strike and pursuant to instructions from TMI.

Under a set of facts similar to the case at bar, this Court in *Olof Nelson Construction Co. v. Industrial Commission*, 121 Utah 525, 243 P.2d 951 (1952), denied benefits to locked-out employees. Although the union instituted a strike against only certain members of the contractors association, those in the group who were not struck engaged in a defensive lockout. The improvement in benefits sought by the union in that case, as here, was sought for all employees in the group, not just those who went on strike. In denying unemployment benefits to all employees, the court focused on the initial selective strike, characterizing it as the economic weapon which created the actual and directly impelling causes of the entire work stoppage.

In *Teamsters, Chauffeurs, and Helpers of America, Local Nos. 222 and 976 of International Brotherhood v. Orange Transportation Co.*, 5 Utah 2d 45, 296 P.2d 291 (1956), this Court reached the same result on the ground that the unions were engaged in concerted action. Defensive action taken by an employer group in response to a selective strike by the union does not shift the responsibility for the creation of the work stoppage.

*Teamsters, Chauffeurs and Helpers of America, Local Unions No. 222 and No. 976 v. Board of Review, Dept. of Employment Security*, 10 Utah 2d 63, 348 P.2d 558 (1960), applied the same test, yet reached a contrary result. Because the initial strike was not part of a plan of concerted action against all employers, the union action underlying that strike was not viewed as the impelling cause behind the subsequent idling of the workmen by the lockout occasioned by management. The Court stated:

> The determination made seems to proceed upon the assumption, as indicated in the emphasized language, that those cases announce some sort of mandate that wherever there are a group of un-

ions on the one side and a group of employers on the other, each group must be held responsible for whatever any member does. We do not regard those cases as standing for that proposition. On the contrary, there is no basis for holding the group responsible for the acts of one unless it is affirmatively established that the group is engaged in a concerted action and that the action of one is in fact done for the group as part of the plan. [10 Utah 2d at 69, 348 P.2d at 561.]

Thus, unemployment compensation was not available to employees of IML because there was sufficient evidence to support a finding that the strike against some of the employers was part of a concerted plan to force acceptance of the union's demands by all of the employers involved. *Teamsters, etc. v. Board of Review, supra; Olof Nelson Construction Co., supra*. This Court in *Teamsters, etc. v. Board of Review, supra*, characterized the facts of *Orange Transportation, supra*, facts not unlike the instant, as constituting such concerted action: "[T]he two opposing groups admittedly had been organized for the purpose and had the authority to bargain for their principals, the unions on the one side and the employers on the other; they were engaged in so bargaining together; and there was a history of their having done so in the past." [348 P.2d at 562.]

The record in the instant case reveals substantial evidence which supports the conclusion that the action of IBT was aimed at all the employers which TMI represented and that the strike was initiated for the purpose of forcing all members of the employer group to yield to the union's demands. The findings of the Board of Review rest on substantial evidence that the groups of workers involved were engaged in concerted action and that the direct cause of unemployment was the decision of the union to strike, albeit selectively.

■ Lastly, plaintiffs contend that the volitional test as applied to a determination of an employee's eligibility for unemployment compensation violates the equal protection and due process clauses of the Con-

stitutions of the State of Utah and the United States on three grounds. First, plaintiffs claim that the disqualifying provision and the volitional test are arbitrary and unrelated to the object of unemployment compensation legislation. The volitional test was adopted in *Olof Nelson, supra*, which adhered to the California approach and quoted from *McKinley v. California Employment Stabilization Commission*, 34 Cal.2d 239, 209 P.2d 602, 605 (1949):

> "[I]n reality, the form of the cessation of employment is not controlling and the determinative factor is the volitional cause of the work stoppage. In other words, although the employees left work of their own choice, that choice was not freely made but was compelled by the economic weapon which the employers used. This is the only sound and fair way to apply the subjective volitional test . . . . ." [243 P.2d at 957.]

To determine whether the volitional test establishes a rational basis for implementing the purpose of the Employment Security Act, it is necessary to consider the underlying policy of that act. Plaintiffs suggest § 34–20–1, Utah Code Ann. (1953), as amended, is illustrative of the state's public policy regarding employment relations. That section establishes the policy of the state to be one that protects and promotes all three major interests involved—the public, the employee, and the employer.

Unemployment compensation is legislatively created to ameliorate the hardship of those who, through no fault of their own, find themselves unemployed. It was not created to enhance the staying power of employees engaged in labor warfare, regardless of the tactics used to make the other side appear to be responsible for a work stoppage. This Court has previously stated in a similar context:

> Undoubtedly one of the considerations prompting the prohibition against workers receiving benefits for unemployment resulting from being involved in a strike is the fact that it would be unfair to use funds built up by labor and management jointly to support labor in a contest

wherein it was exerting economic pressure against management by striking or by participating in or supporting a strike so that it was in fact involved therein. [*Kennecott Copper Corp. Employees v. Department of Employment Security*, 13 Utah 2d 262, 372 P.2d 987 at 990 (1962).]

These considerations are designed to keep the state a neutral party in labor–management negotiations—as well it ought to be. The policy is neither arbitrary nor irrational and does not exceed the freedom and discretion granted the state in setting up its unemployment compensation benefits. See *New York Telephone Co. v. New York State Department of Labor*, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979).

Plaintiffs also contend that the volitional test, not being susceptible to definition or proof, offends constitutional principles of equal protection and due process. The contention has no merit. The case law sets forth appropriate criteria for determining the party actually and directly responsible for the resulting work stoppage.

Plaintiffs' last averment of unconstitutionality is that the disqualifying provision as applied under the volitional test encourages industry–wide strikes, thus violating public policy which promotes industrial peace, regular and adequate income, and uninterrupted production of goods and services. The argument is one to be addressed to the Legislature; it has no constitutional basis.

Judgment affirmed. No costs.

CROCKETT, C. J., and WILKINS and MAUGHAN, HALL, JJ., concur.