Arlend V. ANDERSON, et al.,
Greyhound Employees,
Plaintiffs,

v.

BOARD OF REVIEW OF the INDUSTRIAL COMMISSION OF UTAH, DEPARTMENT OF EMPLOYMENT SECURITY, Greyhound Lines, Inc., Defendants.

No. 20574.

Supreme Court of Utah.

April 24, 1987.

---

Arthur F. Sandack, Salt Lake City, for plaintiffs.

K. Allan Zabel, Lorin R. Blauer, Salt Lake City, for defendant Indus. Com'n.

David A. Anderson, Salt Lake City, for defendant Greyhound.

ZIMMERMAN, Justice:

Plaintiffs ("the employees") are seventy-five Amalgamated Transit Union ("the union") members claiming unemployment compensation under the Utah Employment Security Act ("the Act"). Utah Code Ann. §§ 35-4-1 to -26 (1986). They appeal from a decision of the Industrial Commission Board of Review affirming the administrative law judge's holding that they were not

entitled to unemployment benefits for the period during which they were on strike against their employer, Greyhound Lines, Inc. ("Greyhound"). The employees claim that they were improperly denied benefits because the work stoppage was caused by the company's constructive lockout and not by a strike. Alternatively, the employees contend that Greyhound caused the strike by violating federal labor laws and that they are therefore eligible for unemployment benefits. We affirm the decision of the Board of Review.

In 1980, the union and Greyhound entered into a collective bargaining agreement. The agreement expired at midnight on October 31, 1983. Prior to the expiration of the contract, Greyhound advised the union that it was losing money and would request economic concessions in the new contract, seeking parity in wages and benefits with other carriers. Formal negotiations between Greyhound and the union began on September 14, 1983. On October 5, 1983, the union broke off negotiations in order to take a membership vote on Greyhound's proposal. The proposal was rejected by the union on October 24th, and the membership authorized the union leadership to take strike action.

Greyhound presented a final offer to the union on October 31st, the day the contract expired. That offer represented an 18 to 25 percent reduction in wages and benefits. The union rejected this offer and proposed instead to operate under the old contract for one additional year. Greyhound rejected the union's offer and countered by proposing to extend the terms of the 1980 contract as modified by Greyhound's October 31st offer for a mutually-agreed-upon number of days to permit additional negotiations. Greyhound's offer also provided that when the parties reached a new agreement, it would be made retroactive to November 1st. The union rejected these terms and reaffirmed its offer to extend the 1980 agreement for a year. Greyhound again rejected the union's proposed extension.

On October 31st at 7:00 p.m., the union voted to strike. The 1980 agreement was extended for 48 hours to minimize inconvenience to the public, and the strike began on November 3rd. Greyhound notified the employees that work was available for any employee who wished to work during the strike under the terms of Greyhound's October 31st offer. The employees involved in this action did not attempt to return to work. A final agreement on a new contract containing a substantial reduction in wages and benefits was reached on December 3, 1983.

The employees submitted claims for unemployment insurance for the period of the strike, November 3rd to approximately December 3rd. These claims were denied by the administrative law judge, whose decision was upheld by the Board of Review.

Before the Board, the employees claimed that there was a constructive lockout, not a strike, because Greyhound refused the union's offer to continue work under the terms of the 1980 contract and unilaterally changed the status quo. This change in the status quo, the employees argued, is equivalent to a lockout and cannot operate to deny them unemployment compensation. They relied upon the Pennsylvania Supreme Court decision in *Erie Forge & Steel Corp. v. Unemployment Compensation Board of Review*, 400 Pa. 440, 163 A.2d 91 (1960).[1]

The Board of Review accepted the applicability of the *Erie Forge* test, but held that there was no constructive lockout in this case. In reaching this conclusion, the Board first found that the employees had not qualified for the *Erie Forge* test because "the union did not agree to maintain the status quo for a reasonable time." Al-

---

1. The *Erie Forge* test (also known as the *"Vrotney"* test) is a status quo test: if the employees are willing to extend the previous contract (maintain the status quo) for a reasonable time while negotiations continue and the company refuses, then benefits will be allowed. Conversely, if the company offers to extend the contract and continue operating under the status quo while negotiations continue and the employees refuse, benefits will not be allowed. *Erie Forge & Steel Corp. v. Unemployment Compensation Bd. of Review*, 400 Pa. 440, 444–45, 163 A.2d 91, 93–94 (1960).

ternatively, it found that because of deregulation in the common carrier transportation industry, Greyhound would suffer "serious financial hardship" if the status quo had been maintained. Therefore, the *Erie Forge* test could not be satisfied because Greyhound qualified for the employer's hardship exception to that rule. *See Oriti v. Board of Review, Ohio Bureau of Employment Services,* 7 Ohio App.3d 311, 313–14, 455 N.E.2d 720, 723–24 (1983). This appeal followed.

Before this Court, the parties and the Board essentially reargue the correctness of the Board's application of the *Erie Forge* rules. However, we conclude that all parties' reliance on the status quo test and its exceptions, as spelled out in *Erie Forge* and *Oriti,* is misplaced.

Explaining our rejection of the premises relied upon by both the employees and the Board requires a rather lengthy examination of a portion of Utah's unemployment compensation statute. At issue is the application of the Utah Employment Security Act, Utah Code Ann. § 35-4-5 (1986), which states:

> An individual is ineligible for benefits or for purposes of establishing a waiting period:
>
> . . . .
>
> (d) For any week in which the commission finds that his unemployment is due to a stoppage of work which exists because of a strike involving his grade, class, or group of workers at the factory or establishment at which he is or was last employed.
>
> (1) If the commission finds that a strike has been fomented by a worker of any employer, none of the workers of the grade, class, or group of workers of the individual who is found to be a party to the plan, or agreement to foment a strike, shall be eligible for benefits.

> However, if the commission finds that the strike is caused by the failure or refusal of any employer to conform to the provisions of any law of the state of Utah or of the United States pertaining to hours, wages, or other conditions of work, the strike shall not render the workers ineligible for benefits.

Under the terms of the Act, the Industrial Commission must make three specific findings to determine eligibility for benefits: (i) whether there was a work stoppage, (ii) if there was a work stoppage, whether it was caused by a strike, and (iii) if it was caused by a strike, whether the strike was caused by the employer's failure to conform to either state or federal laws on hours, wages, or other working conditions. In illustrating the application of these criteria to the present case, each of the statutory requirements will be separately analyzed.

The first question is whether there was a work stoppage. A majority of states interpreting the term "stoppage of work" in similar statutes have ruled that it refers to a substantial cessation or stoppage of the employer's operation, not of the individual employee's work.[2] In those states, therefore, a "work stoppage" is distinguished from a "strike" because a strike does not always result in a substantial cessation of an employer's operations. For example, some businesses continue to operate during a strike by replacing striking personnel, or a strike may affect only one operating unit and other units may maintain normal production. *E.g., Continental Oil Co. v. Board of Labor Appeals,* 178 Mont. 143, 155–58, 582 P.2d 1236, 1243–45 (1978).

A minority of jurisdictions consider "stoppage" and "strike" as synonymous terms and argue that "stoppage of work" refers to the labor of the individual employ-

---

**2.** This is consistent with the interpretation of the "trade dispute" disqualification of the British Unemployment Insurance Acts upon which most state statutes are based. *Continental Oil Co. v. Board of Labor Appeals,* 178 Mont. 143, 147–48, 582 P.2d 1236, 1239–40 (1978) (relying on Shadur, *Unemployment Benefits and the "La-* *bor Dispute" Disqualification,* 17 U.Chi.L.Rev. 294, 308 (1950)). *See also Twenty Eight (28) Members of Oil, Chemical & Atomic Workers Union, Local 1–1978 v. Employment Sec. Div.,* 659 P.2d 583, 587 (Alaska 1983); *Inter-Island Resorts, Ltd. v. Akahane,* 46 Hawaii 140, 146–47, 377 P.2d 715, 719–20 (1962).

ee.[3] Under this rule, an individual who stops work because of a labor dispute is disqualified from unemployment benefits regardless of whether the employer's operation is shut down during the strike. *See, e.g., Board of Review v. Mid-Continent Petroleum Corp.*, 193 Okla. 36, 141 P.2d 69 (1943).

■ The Utah statute is consistent with the majority rule. The statute uses both "stoppage of work" and "strike" in the same sentence and in a context which shows that they are not coterminous: an employee is ineligible for benefits when his unemployment is due to a "stoppage of work which exists because of a strike." Thus, ineligibility for benefits will occur only when there has been a strike *and* when that strike results in a work stoppage. This Court impliedly accepted the majority rule in *Employees of Utah Fuel Co. v. Industrial Commission*, 99 Utah 88, 104 P.2d 197 (1940). We now expressly adhere to that position.

In the instant case, the Commission did not expressly find that Greyhound experienced a work stoppage. However, the arguments of all the parties, both here and below, are based upon the assumption that a work stoppage did, in fact, occur. There is no indication in the record that Greyhound experienced anything less than a substantial cessation of operations forty-eight hours after the strike vote. The theory of the employees' case is based upon the existence of a work stoppage. Under the circumstances, we can proceed only on the assumption that this presumed fact is true.

The second question to be answered in determining whether the employees are entitled to compensation under section 5(d) of the Act is whether Greyhound's work stoppage existed "because of a strike." Utah's section 5(d) is rather unique, and an explanation of its origins assists in its interpretation.

In 1935, Congress passed the Social Security Act. Ch. 531, 49 Stat. 620 (1935) (codified as amended at 42 U.S.C. §§ 301–1397 (1976)). Under it, states could qualify for federal funding of state unemployment compensation programs; however, the state programs had to meet certain specified criteria. By early 1937, every state had enacted statutes creating qualifying programs. *See* Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification*, 17 U.Chi.L.Rev. 294, 294 (1950).

In their haste to meet the qualifying deadline fixed by the federal act, most state legislatures patterned their enactments after one of several "draft bills" prepared by the Committee on Economic Security. *Id.* The draft bill used as a model by a majority of states contained the following provision excluding from benefit eligibility workers idled because of work stoppages caused by labor disputes.

An individual shall be ineligible for benefits....

For any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute ....

*Id.* at 295. Under this draft bill provision, the worker is denied benefits any time a work stoppage is caused by a labor dispute, without regard to whether the manifestation of that dispute is a lockout or a strike.[4] Presumably, such provisions were premised on the thought that it is inequitable to use

---

**3.** Only three states follow the minority rule. New Mexico amended its statute to legislatively adopt this rule. 1979 N.M. Laws ch. 280, § 14; *Wellborn Paint Mfg. Co. v. New Mexico Employment Sec. Dep't.*, 101 N.M. 534, 537, 685 P.2d 389, 392 (N.M.App.1984). The Texas statute also adopts this rule by referring specifically to the *"claimant's* stoppage of work." Tex.Rev.Civ. Stat.Ann. art. 5221b-3(d) (Vernon 1971 & Supp.1985); *Norris v. Texas Employment Comm'n*, 688 S.W.2d 125, 128 (Tex.App.1985). Oklahoma is the only state to have judicially adopted the minority interpretation of "stoppage of work." *Board of Review v. Mid-Continent Petroleum Corp.*, 193 Okla. 36, 39, 141 P.2d 69, 72 (1943).

**4.** Labor-management conflict may be manifested in various ways, including threats, violence, strikes, lockouts, etc. However, strikes and lockouts are the two dispute manifestations that most typically cause work stoppages and unemployment.

funds built up jointly through the contributions of labor and management to sustain labor alone during an economic battle with management. *See, e.g., Daniel v. Industrial Commission*, 617 P.2d 381, 387 (Utah 1980).

Although not all states adopted the above-quoted draft bill provision, every state unemployment compensation statute includes a provision of some sort dealing with unemployment caused by labor disputes. A recent government survey of state unemployment compensation statutes reveals that today, most states (thirty-one of fifty) continue to deny compensation to unemployed workers where a work stoppage is caused by *any* manifestation of a labor dispute. U.S. Dept. of Labor, Unemployment Insurance Service, *Comparison of State Unemployment Insurance Laws*, 4–45, table 405 (Sept. 1985).

At present, a minority of states (nineteen of fifty), including Utah, permit unemployed workers to receive compensation if the work stoppage resulting in their unemployment was caused by a lockout. *Id.* Most of these states have achieved this result by adding the words "other than a lockout" at the end of the draft act's "labor dispute" exclusion.[5] Under these statutes, an unemployed person may receive compensation if the work stoppage is caused by a lockout, but not if the work stoppage results from any other manifestation of a labor dispute.

Utah's benefit exclusion is even more narrow. Under section 35–4–5(d), benefits are denied only when a work stoppage exists "because of a strike." This is not a new provision. Utah adopted this narrow version of the exclusion in 1936 and has not changed it since. It is reasonable to assume that by rejecting the broad exclusions originally adopted elsewhere, Utah's legislature concluded that labor and management were not evenly matched in their economic struggles and that unless workers were unemployed because they had struck, they were entitled to compensation.

The question here, then, is whether the stoppage of work was caused by a strike. While that issue might be complicated in certain situations, *e.g., Employees of Utah Fuel Co. v. Industrial Commission*, 99 Utah 88, 104 P.2d 197 (1940) (resolving factual question of whether strike or lack of business caused work stoppage), the issue of work stoppage causation is a factual one for the Industrial Commission. In this case, the Board of Review found that the work stoppage was caused by a strike.

The union broke off negotiations on October 5, 1983, to have its membership vote on a Greyhound proposal. Greyhound's offer was rejected and the members authorized the union to take strike action. Following further unsuccessful negotiations, the union voted to strike and sent its members a list of suggested picket line procedures. This occurred on October 31, 1983. On November 2nd, Greyhound erected a fence around its property in Salt Lake City, but the Board found that employees could have entered the property to work had they so desired. On November 3rd, the strike began, and on the same day, Greyhound sent a mailgram to each of its employees requesting that he or she return to work by November 14th. The Board found that the company had work available for any employee who wished to work during the strike.

■ The employees do not attack these factual findings. Therefore, for purposes of review, we take as given that a strike occurred and that Greyhound did not prohibit or prevent its employees from work-

5. *E.g.,* Pa.Stat.Ann. tit. 43, § 802(d) (Purdon 1964) (An employee is disqualified from receiving benefits if his unemployment is "due to a stoppage of work which exists because of a labor dispute (other than a lockout)."). Wording similar to Pennsylvania's is common in other states' acts. *See* Ark.Stat.Ann. § 81–1105(f) (1976); Conn.Gen.Stat. § 31–236(a)(3) (1985); Ky.Rev.Stat.Ann. § 341.360(1) (Michie/Bobbs-Merrill Supp.1986); Md.Ann. Code, art. 95A, § 6(e) (1985); Minn.Stat. § 268.09, subdiv. 2(a), (b) (1984); Miss.Code Ann., § 71–5–513(A)(5) (Supp.1985); N.H.Rev.Stat.Ann. § 282:4(F)(3) (1977); Ohio Rev. Code Ann. § 4141.29(D)(1)(a) (Anderson Supp.1985); W.Va.Code § 21A–6–3(4) (1985); *see also* Annot., *Unemployment Compensation: Application of Labor Dispute Disqualification for Benefits to Locked Out Employee*, 62 A.L.R.3d 437 (1975 & Supp.1986).

ing. On the contrary, work was available, and Greyhound encouraged its employees to be on the job as usual. It is evident that if the employees had shown up for work, operations would not have been curtailed. Therefore, the work stoppage in this case was caused by the strike, *i.e.,* the employees' refusal to work.[6] *See, e.g., Kennecott Copper Corp. Employees v. Department of Employment Security,* 13 Utah 2d 262, 265, 372 P.2d 987, 989 (1962) ("[T]he one who first resorts to the use of work stoppage as a means of putting on economic pressure to settle [a labor] dispute must bear the responsibility therefor."). *Cf. Lee-Norse Co. v. Rutledge,* 291 S.E.2d 477, 479 (W.Va.1982).

The third and final question to be answered in determining whether the employees are entitled to benefits is whether the strike was caused by some conduct of the employer that was so improper that even striking employees should receive benefits. This is the focal point of the Board's ruling below and of the briefs of both parties before this Court.

The employees argue that they qualify for the "constructive lockout" doctrine, as articulated in *Erie Forge & Steel Corp. v. Unemployment Compensation Board of Review,* 400 Pa. 440, 163 A.2d 91 (1960), and its progeny. *See supra* note 1 and accompanying text. Under that doctrine, employees who strike in response to certain improper actions of their employer are considered to have been constructively "locked out" and to have qualified for the lockout exception many states have added to their "labor dispute" disqualification provision. *See supra* p. 216. In the present case, the employees contend that under *Erie Forge,* they were constructively locked out because the strike was caused by Greyhound's unilateral imposition of wages and working conditions that were significantly less favorable than those existing under the expired contract.

■ As noted previously, the Board of Review accepted the employees' premise—that the constructive lockout doctrine of *Erie Forge* applies in Utah. However, after analysis, the Board concluded that the facts of this case did not warrant the finding of a constructive lockout for several reasons. We do not review the propriety of the Board's application of the intricacies of the *Erie Forge* rules to the specific facts of this case; rather, we reject in its entirety the Board's conclusion that the constructive lockout doctrine has any application under Utah's unemployment compensation statute.

*Erie Forge* and cases that have followed its approach were decided under statutes modeled after the draft bill quoted earlier, statutes that have since been modified through the addition of a lockout exception. They now provide that employees may not receive benefits if they are unemployed due to a work stoppage which exists because of a "labor dispute (other than a lockout)." *E.g.,* Pa.Stat.Ann. tit. 43, § 802(d) (Purdon 1964); Ohio Rev. Code Ann. § 4141.-29(D)(1)(a) (Anderson Supp.1985).

Because these statutes do not define the word "lockout," the courts in these states have been free to interpret the term to include employer actions that were judged by the courts to be improper and, therefore, could be said to have "caused" the responsive strike by employees and the ensuing work stoppage. In contrast, Utah's unemployment compensation act does not include the word "lockout"; it simply denies benefits if the work stoppage is caused by a "strike." This leaves us little room to redefine that word to exclude strikes caused by what we might judge to be improper management actions.

There is an additional difference in the wording of the Utah statute that stands as an even stronger barrier to any attempt to incorporate the constructive lockout doctrine into our law. Statutes such as Pennsylvania's, as well as the draft bill upon

---

**6.** The employees do not seriously contest the fact that their strike caused a work stoppage. Rather, they attempt to extend the chain of causation back another link; the employees argue that Greyhound's improper actions caused them to strike and that the work stoppage therefore was caused by Greyhound's actions, not by their strike. This argument is addressed in the following portion of this opinion.

which they were modeled, do not contain any provision explicitly addressing the question of which actions of an employer will be considered "improper" and will justify giving unemployment benefits to striking employees. This leaves room for courts to read such content into the undefined term "lockout." However, section 35–4–5(d)(1) of our code clearly and specifically addresses the issue:

> [I]f the commission finds that the *strike is caused* by the failure or refusal of any employer to conform to the provisions of any law of the state of Utah or of the United States pertaining to the hours, wages, or other conditions of work, the strike shall not render the workers ineligible for benefits.

Utah Code Ann. § 35–4–5(d)(1) (1986) (emphasis added).

 Under the well-settled maxim of statutory construction *expressio unius est exclusio alterius,*[7] the plain implication of the language of section 35–4–5(d)(1) is that strikes caused by actions of an employer other than those specified are not excepted from the strike exclusion. There is nothing in the legislative history, the cases, or the arguments presented to us that convincingly shows that we should depart from this construction of the statute.

As a public policy matter, the approach taken in *Erie Forge* may advance peaceful resolution of labor disputes and may be very beneficial to the employees and to the public at large, for the public is always indirectly harmed by a cessation of work. The employees' arguments, however, are addressed to the wrong forum. The pertinent statutory provisions have remained unchanged since 1936.[8] If there is a need for the inclusion of additional exceptions in section 35–4–5(d)(1), suggestions for such changes are more appropriately directed to the legislature.[9]

The employees also argue that this Court has adopted the substance of the constructive lockout doctrine when, in several of our cases, we relied upon the "volitional test" developed by the California courts. Under the volitional test, an employee is eligible for benefits unless the unemployment results from the "voluntary" act of the employee. *McKinley v. California Employment Stabilization Commission,* 34 Cal.2d 239, 243–44, 209 P.2d 602, 605 (1949); *Bodinson Manufacturing Co. v. California Employment Commission,* 17 Cal.2d 321, 328, 109 P.2d 935, 940 (1941). If a court applying the volitional test finds that a worker's unemployment was involuntary, i.e., not due to the worker's volitional acts, then the worker is eligible for benefits.

---

7. "Expression of one thing is the exclusion of another." For other Utah cases applying this maxim, see, e.g., *Hanson v. Wilkinson,* 658 P.2d 1216, 1217 (Utah 1983); *Cannon v. Gardner,* 611 P.2d 1207, 1209 (Utah 1980); and *Olympia Sales Co. v. Long,* 604 P.2d 919, 921 (Utah 1979).

8. On August 24, 1936, Governor Henry H. Blood called the legislature in special session and encouraged it to enact a proposed unemployment compensation statute which included the provisions at issue here. In his message to the legislature, the governor stated:

> I desire to express my appreciation of the fair-mindedness and cooperative spirit shown by representatives of organized labor and of employers during the preparation of this proposed bill. I remember no finer exhibition of sincere desire to arrive at a proper conclusion, fair to industry and labor, than that shown throughout these negotiations. Senate Journal, 1936 Special Session, at 12.

Since employers and representatives of organized labor worked together in drafting the provisions of Utah's unemployment compensation statutes, it can be assumed that each was vigilant to protect its own interests and that each was satisfied with the compromises expressed in the statute's language.

9. Other state legislatures have addressed the issue of causation of strikes and have enacted statutory provisions which establish rules similar to those the employees ask us to adopt through judicial interpretation of the Utah act. For example, under the Connecticut statute, benefits for strikers are not excluded if that strike is caused when "an employer makes an announcement that work will be available after the expiration of the existing contract only under terms and conditions which are less favorable to the employees than those current immediately prior to such announcement...." Conn. Gen.Stat.Ann. § 31–236(a)(3)(C)(ii) (1985); *cf.* W.Va.Code § 21A–6–3(4) (1985) (no disqualification if striking employees were required to accept wages, hours, or conditions of employment substantially less favorable than those prevailing for similar work in the locality).

It is true that this Court has applied the volitional test, but only in a very narrow situation. In *Olof Nelson Construction Co. v. Industrial Commission*, 121 Utah 525, 243 P.2d 951 (Utah 1952), a union engaged in a strike against some members of a multi-employer bargaining association. In response, all the employers ceased operations. Nonstriking employees sought compensation, arguing that they were unemployed due to the employers' lockout rather than because of their own volitional acts. This Court rejected the employees' argument because the strike was directed against the entire employer association and was called on behalf of the nonstriking employees, as well as the striking employees. The Court observed that "[t]he strike was fomented by claimants through their duly authorized union representatives." *Id.* at 539, 243 P.2d at 959. Thus, the employees were found to be unemployed due to their own volitional acts and were held ineligible for benefits.

■ Our other cases that have applied the volitional test presented factual and legal issues similar to those in *Olof Nelson*. *See Daniel v. Industrial Commission of Utah*, 617 P.2d 381 (Utah 1980); *Kennecott Copper Corp. Employees v. Department of Employment Security*, 13 Utah 2d 262, 372 P.2d 987 (1962); *Teamsters, Chauffeurs and Helpers of America, Local Unions No. 222 and No. 976 v. Board of Review, Department of Employment Security*, 10 Utah 2d 63, 348 P.2d 558 (1960); *Teamsters, Chauffeurs, and Helpers of America, Locals No. 222 and 976 of International Brotherhood v. Orange Transportation Co.*, 5 Utah 2d 45, 296 P.2d 291 (1956). In each case, there was an underlying assumption on the part of the Court and the parties that striking is a volitional act that renders an employee ineligible for benefits. The workers in each case were locked out and were arguing that they were not disqualified under the volitional test because they did not go on strike. We have never applied the volitional test in a way that would permit employees who went on strike to receive benefits.[10]

In the present case, the employees ask us to apply the volitional test in a new situation. They argue that their strike was not volitional because Greyhound's actions forced them to strike and thus caused the work stoppage. The employees cite *Bunny's Waffle Shop, Inc. v. California Employment Commission*, 24 Cal. 735, 151 P.2d 224 (1944), as support for the proposition that the volitional test can be applied in this way and observe that *Bunny's Waffle Shop* has been cited with approval in some of our cases using the volitional test. We do not find *Bunny's Waffle Shop* to be persuasive authority. Our citation of *Bunny's Waffle Shop* was only for a general statement of the volitional rule; it was not a general endorsement of whatever application the California courts might make of the principles there stated.

In the thirty-five years since the *Olof Nelson* case, this Court has never used the volitional test to resolve a causation-of-strike issue. Now that we are faced squarely with the question, we conclude that the test should not be applied to determine this issue because it would be inconsistent with the language and purpose of our act.

The California statute on which the volitional test was based provides that an individual is ineligible for benefits "if he left his work because of a trade dispute." California Unemployment Insurance Code, § 1262 (West 1986). Much like the Pennsylvania and the model draft acts, the Cali-

---

**10.** Although in *Daniel v. Industrial Comm'n*, 617 P.2d 381, 385 (Utah 1980), the Court observed that the employees had not offered to extend the previous contract, analysis convinces us that the Court in *Daniel* did not intend to adopt the *Erie Forge* status quo test as a part of Utah law. *Daniel* did not use the words "status quo" and did not cite *Erie Forge* or any other case applying a status quo test. In addition, *Daniel* did not discuss the fact that the Utah statute is worded very differently than the Pennsylvania statute under which *Erie Forge* was decided. We conclude that *Daniel* did not purport to adopt a new test for determining eligibility for unemployment benefits, but only applied the "volitional test" previously adopted by this Court in *Olof Nelson Construction Co. v. Industrial Comm'n*, 121 Utah 525, 243 P.2d 951 (1952).

fornia act does not undertake to address the issue of strike causation, thus leaving the courts room to develop their own interstitial rules on the matter. As indicated above, the Utah legislature specifically addressed the issue of strike causation; its resolution of that issue is binding on this Court.

The policy implicit in the Utah statute also argues against our using the volitional or any other test to develop a court-created constructive lockout doctrine. The heart of any such doctrine is that courts will be given license to decide who they judge to be "at fault" in causing a breakdown in negotiations between management and labor. If a court concludes that labor is at fault, then it will say there is no constructive lockout; if it decides the fault lies with management, then it will call the result a constructive lockout. Since every strike is a result of actions by both management and labor, the constructive lockout doctrine gives courts great discretion to decide what sort of conduct they will choose to sanction, all without any substantial guidance from the legislature. In fact, a brief examination of the case law dealing with both the *Erie Forge* test and the California volitional test reveals little consistency in analysis or in result. Despite attempts to state in objective terms the tests by which these courts are making their judgments, the conclusion is inescapable that the courts are lost in a morass of subjective judgments about what is and what is not proper conduct by management and labor.[11]

Utah's act, by avoiding the vague "labor dispute" language common in other stat- utes and by inserting a specific listing of management conduct that will exempt striking employees from the exclusion of section 35-4-5(d), has taken an entirely different tack. Its very explicitness appears designed to discourage courts from engaging in the sort of subjective fault-finding that the constructive lockout doctrine has produced. As we said in *Daniel v. Industrial Commission*, 617 P.2d at 381, Utah's strike exclusion was "designed to keep the state a neutral party in labor-management negotiations, as well it ought to be." That neutrality is best maintained by abiding by the plain terms of the statute and by keeping the Industrial Commission and the courts out of the business of making their own rules for determining who is "at fault" for each strike.

The only question remaining under the express language of section 35-4-5 is whether the strike was the employees' response to impermissible conduct on the part of the employer. If it was, the employees still may be eligible for benefits under the Utah statute. That section provides:

> [I]f the commission finds that the strike is caused by the failure or refusal of any employer to conform to the provisions of any law of the state of Utah or of the United States pertaining to hours, wages or other conditions of work, the strike shall not render the workers ineligible for benefits.

Utah Code Ann. § 35-4-5(d)(1) (1986). As noted above, this provision makes a narrow exception to the basic policy judgment that

---

11. *See, e.g.,* Comment, *Pennsylvania's Lockout Exception to the Labor Dispute Disqualification from Unemployment Compensation Benefits: Federal Challenges and Issues,* 80 Dick.L.Rev. 70, 75 (1975) (The Pennsylvania approach is "difficult to understand and difficult to justify. While ostensibly not exploring the merits of a labor dispute when determining eligibility for benefits, administrative personnel using the fault standard to distinguish strikes from lockouts must examine carefully both sides of a labor dispute unless the distinction is to be mechanically and irrationally applied."); Williams, *The Labor Dispute Disqualification—A Primer and Some Problems,* 8 Vand.L.Rev. 338, 367, 369 (1955) (criticizing constructive lockout doctrine as unworkable—because determining who was the acting party in causing a work stoppage is often "an utterly hopeless task"— and as artificial—because it pretends to be something other than state involvement in the merits of labor disputes); Horn, *Neutrality, Causation and Commonsense Terminating the Trade Dispute Disqualification in California,* 1 San Fern. V.L.Rev. 36, 41–45 (1967) (neutrality has been abandoned under the California volitional test); Lewis, *The Lockout Exception: A Study in Unemployment Insurance Law and Administrative Neutrality,* 6 Cal.W.L.Rev. 89, 112, 113 (1969) (The status quo and volitional tests "skirt dangerously close to an evaluating of the substantive issues underlying the labor-management controversy," a danger avoided by Utah-type statutes.).

any work stoppage caused by a strike deprives the workers of benefits. When the employer violates the labor laws, the state will subsidize the subsequent strike, even though the strike stops all work.

The employees argue that they qualify for this exception because the strike was caused by Greyhound's violation of federal labor laws. The employees cite a variety of company activities which they believe are unfair labor practices under section 8(a) of the National Labor Relations Act,[12] including threats of loss of employment or benefits, picket line surveillance, and circumvention of the collective bargaining agreement.

■ Greyhound disputes this claim in three ways. It first argues that the unfair labor provisions relied on by claimants are not laws "pertaining to hours, wages, or other conditions of work," as those terms are used in section 35–4–5(d)(1) of the Code, and that those are the only violations that can trigger the operation of that section. Second, Greyhound contends that even if claimants' alleged violations do fall within section 35–4–5(d)(1), the National Labor Relations Board has exclusive and preemptive jurisdiction to decide whether an employer has committed an unfair labor practice under federal law. Lastly, Greyhound argues that it did not, in fact, commit the alleged unfair labor practices. We find that the alleged violations do not relate to "hours, wages, or other conditions of work"; therefore, we need not reach Greyhound's second and third contentions.

■ Most of Greyhound's alleged labor law violations pertain to the bargaining process. Only the alleged imposition of Greyhound's October 31st offer with a retroactivity provision could be said to directly affect wages, hours, or conditions of work. The employer's implementation of its proposals after negotiations have reached an impasse, however, is not prohib-

ited by law. *American Federation of Television & Radio Artists v. N.L.R.B.,* 395 F.2d 622, 624 (D.C.Cir.1968). We therefore conclude that section 35–4–5(d)(1) has not been triggered here.

In this case, Greyhound suffered a work stoppage that existed because of a strike. The strike was not a result of Greyhound's nonconformance with the law, but was a voluntary action taken by the employees in the course of negotiating a new contract. The decision of the Board is therefore affirmed.

HALL, C.J., STEWART, Associate C.J., and HOWE and DURHAM, JJ., concur.

---

12. Section 8(a) of the National Labor Relations Act, codified at 29 U.S.C. § 158(a) (1982), provides in pertinent part:

 (a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 157 of this title;

 . . .;

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of Section 159(a) of this title.